[No. S027766. Aug. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN COLE, Defendant and Appellant.

Counsel

Richard P. Siref, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Victoria B. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**WERDEGAR, J.—**

INTRODUCTION

Defendant Stephen Cole was convicted by a jury in Los Angeles County Superior Court of the first degree murder of Mary Ann Mahoney (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) and arson (§ 451, subd. (b)). The jury also sustained a special circumstance allegation that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).) A mistrial was declared on a further special circumstance allegation that defendant committed the murder while engaged in the commission of arson. (Former § 447, now § 451, subd. (b); § 190.2, former subd. (a)(17), now subd. (a)(17)(H).) The jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

## I. FACTS

A. *Guilt Phase*

1. *People's Case-in-chief*

Mary Ann Mahoney and defendant moved to California from the East Coast in 1986. They lived with Mary Ann's mother, Gertrude Mahoney, in her North Hollywood apartment for two weeks and then moved to their own apartment nearby. Shortly thereafter, Mary Ann's brother, Richard Mahoney, having observed physical injuries on Mary Ann that he presumed defendant had caused, asked defendant to leave Mary Ann. Defendant left California, and Mary Ann moved back in with Gertrude. Approximately one month later, defendant returned to California and apparently began living on the street in front of Gertrude's apartment. Shortly thereafter, defendant and Mary Ann moved together two more times and then, in April 1987, representing themselves as Mr. and Mrs. Mahoney, rented a house from William Gornik on North Whitnall Highway in North Hollywood.

Mary Ann and defendant had a tumultuous relationship. They bickered and argued, and their regular screaming matches, punctuated by profanities, were often heard by family and neighbors. During this period, defendant was twice convicted of cohabitant abuse, a misdemeanor, based on his conduct towards Mary Ann. Defendant was very possessive of her.

On August 13, 1988, Mary Ann told her mother's neighbor, Jacquelyn Blakely, that she planned to give notice to Gornik within three days that she would be moving out without defendant and moving back in with her mother. Mary Ann also indicated that defendant had seen a list of shelters for battered women that Blakely had previously given to her.

On August 14, 1988, Nicholas Snyder, a friend of defendant and a patron of the Red Rooster—a neighborhood bar where Mary Ann worked—saw defendant and Mary Ann walk into that bar shortly before the start of Mary Ann's 10:00 a.m. shift. Snyder left the bar at 11:00 a.m. When he returned at 4:00 p.m., defendant was there. Defendant asked Mary Ann if he could take her car to the Silver Moon, another bar located approximately one-half to three-quarters of a mile from their house. Mary Ann said no. Defendant then asked for a ride from Snyder, who agreed to give him one. When Snyder dropped defendant off at the Silver Moon about 4:30 p.m., defendant was "high" but not drunk.

At approximately 9:00 p.m., the Los Angeles Fire Department received a report of a fire at the North Whitnall Highway residence. Los Angeles

Firefighter Zane Testerman and Chief Wilford Bisson were the first to arrive on the scene. Soon after Testerman parked the fire department's sedan in front of the house, defendant knocked on the driver's side window. When Testerman rolled down the window, defendant said, "I'm the one you're looking for. I lit the house on fire." Bisson radioed for the police, and Testerman got out of the car to detain defendant.

Defendant continued speaking spontaneously. He stated, "I lit the house on fire and I tried to kill my old lady." Defendant said he was angry at his landlord because the landlord was planning to build a new apartment building at the site of the burning house, and that he was angry at his "old lady" and wanted to kill her. Defendant repeatedly said that he was angry at both Mary Ann and his landlord, and that he wanted to kill Mary Ann and burn the house down. When Testerman asked how defendant had lit the fire, defendant responded, "Well, I poured gasoline on [Mary Ann] and in the house and lit her and the house on fire." Defendant appeared to be coherent, did not seem to be excited or injured, and did not smell of alcohol. The police arrived shortly thereafter and took custody of defendant.

When the arson investigator arrived at the scene at approximately 9:40 p.m., Mary Ann was being placed into an ambulance. She had suffered severe burns to her upper torso and head area and was having difficulty breathing. She was also agitated, angry, and afraid. The arson investigator spoke with Mary Ann during the short ambulance ride to Riverside Hospital and in the emergency room. Mary Ann said that she and defendant had argued earlier that evening, that defendant was extremely jealous of her, that he had followed her around all day, and that he thought she was cheating on him. She said she was asleep in bed but woke up when she smelled gasoline. When she did, defendant was standing over her and pouring gasoline on her. Defendant then lit the gasoline on fire. Mary Ann said that defendant tried to kill her and that she thought she was going to die.

After speaking with Mary Ann at the hospital, the arson investigator returned to the scene and began his investigation. He determined that approximately one gallon of a flammable liquid had been poured in two distinct areas in the front bedroom—near the bedroom door and at the foot of the bed—and ignited separately with an open-flame device. There was no way to determine which of the two areas was ignited first. A five-gallon container smelling of gasoline was found but determined not to have been used in the fire.

The arson investigator interviewed defendant at the police station shortly after midnight, and an audiotape recording of the interview was played for the jury. At the beginning of the interview, defendant insisted on taking an

intoxilizer test, which the police administered. At trial, the parties stipulated that two readings from the test indicated defendant had blood-alcohol levels of 0.25 and 0.26 grams of alcohol per 100 milliliters of blood. During the interview, defendant admitted setting Mary Ann and the house on fire, and he described the events leading up to that point.

Defendant told the police that at approximately 10:00 a.m. on the day of the crimes, he drove Mary Ann to work at the Red Rooster and drank one beer there. He then drove home and spent most of the day cleaning the house and car, during which time he drank four more beers. Defendant picked up Mary Ann from work sometime after 6:00 p.m.—the end of her shift—and she dropped him off at home before heading back out with the car to the Silver Moon. Defendant got a ride to the Silver Moon from his friend Nick, who dropped him off there about 8:00 p.m. At the Silver Moon, defendant drank another beer. Defendant spoke to Mary Ann, but she refused to leave the bar, cursing and calling him a "no good bastard." Defendant left the Silver Moon shortly before 9:00 p.m. and walked home.

Defendant also told the police that, when he walked inside the house, Mary Ann was "passed out" on the bed. She woke up, called him a "no good mother fucker," and asked him where he had been. According to defendant, she said, "one of these fuckin' days I'm going to burn you to fuckin' bits and I'm going to cut your goddamn heart out." Mary Ann also said, "if you lay down on that goddamn couch, . . . I'll put a butcher knife in your ass." Defendant went "berserk," cursed and called Mary Ann a "no good bitch." He then retrieved a plastic carton containing nearly one-half gallon of gasoline from the patio, walked to the bedroom with it, poured approximately a quart of gasoline on the bedroom floor, threw the carton toward the bed where Mary Ann lay, spilling gasoline on Mary Ann in the process, and threw a burning cigarette lighter, igniting the fire. According to defendant, "the fuckin' thing just went." Defendant told police that he left through the back door to make sure his pet dogs and cats escaped, and then returned and helped Mary Ann out of the house through the front door.

Defendant told police he was "pissed off" at Mary Ann but that his mind was also on his landlord, who had offered him money if he burned the house down. He also mentioned that his rent was due the next day and that his landlord had recently remodeled other nearby properties.

William Gornik, defendant and Mary Ann's landlord, testified that defendant told him shortly before the fire that he was going to have a difficult time paying the rent, which was due on the 15th of every month. Defendant did not, however, ask for an extension. Gornik told defendant to "do the best" he could. Gornik testified that he never asked defendant to burn down the North Whitnall Highway property or any other property.

Mary Ann was transferred to the Torrance Burn Center in Los Angeles County in the early morning hours of August 15. She had suffered burns over approximately 50 percent of her body, including third degree burns to her hair, face, neck, upper arms, chest, back, and legs. She had severe respiratory problems and was placed on special life-support ventilators. Various catheters were inserted to measure blood and pulmonary artery pressures and to administer fluids. Incisions were made along the length of Mary Ann's limbs so that her tightly burned skin would be able to expand and not block blood flow to her extremities.

Mary Ann experienced pain from her burns, pain from the swelling of her face and eyes, pain from the ventilator tube in her neck, pain from skin grafting, pain when the dressings on her wounds were changed, and pain when she was moved so the bed sheets could be changed. She was very agitated, restless, and angry, thrashing about in her bed. She was given large doses of Valium and morphine, but they did not appear to diminish her pain. She seemed frightened of what was happening and longed to die. Her pain was severe but tapered off as she approached death. After four or five days, she became unresponsive. A few days later, she suffered multiple organ system failure, and her extremities turned black. Had she survived, her hands and feet would have been amputated. She died on August 25, 1988. An autopsy established that she died of multiple organ system failure as a result of smoke inhalation and burns.

### 2. *Defense Case*

The defense endeavored to show that defendant was guilty of only second degree murder by presenting evidence that he was reacting to Mary Ann's burst of anger and was under the influence of alcohol when he ignited the fire. The defense also endeavored to show that defendant intended solely to kill Mary Ann, not to commit arson.

Lisa Leone, the next-door neighbor of Mary Ann's mother Gertrude, met Mary Ann and defendant shortly after they moved to California and moved in with Gertrude. Leone, who rarely saw defendant without a beer in his hand, believed defendant was a "functioning alcoholic." Occasionally, she saw Mary Ann drinking beer but not to the point of intoxication. Leone often heard loud arguments between Mary Ann and defendant in the late afternoon and early evening hours.

In August 1988, Steve Hoeck and David Carpenter lived in the house next door to Mary Ann and defendant. Both testified that although defendant drank beer from morning until night on a daily basis, he could hold his liquor and was a "functional drunk." They also testified that Mary Ann and defendant argued frequently, including shouting and yelling profanities at each other.

Defendant testified on his own behalf at trial. He met Mary Ann in the spring of 1982 or 1983 when they worked as grooms for different horse trainers on a racetrack circuit in New Hampshire. They moved in together within days of meeting, and they continued working in the same racetrack circuit. From early on in their relationship, they drank beer together—with defendant drinking as many as 12 beers a day—and they argued frequently, sometimes violently.

Mary Ann and defendant moved to California, initially living with Mary Ann's mother Gertrude in North Hollywood for two weeks and then renting their own apartment for approximately two months. The two continued to drink together and argue. Defendant then moved back to New Hampshire for a month to work as a groom. He returned to California after receiving telephone calls from Mary Ann. By that point, Mary Ann had moved back in with Gertrude. Defendant lived in his car because Gertrude would not allow him back into her house. Mary Ann and defendant resumed their volatile relationship. They obtained jobs at a warehouse. Defendant worked there for approximately 16 months and quit in November 1987. Mary Ann worked there until Christmas 1987.

Defendant usually went to the Red Rooster, a neighborhood bar, early in the morning to drink beer. When the owner of the bar wanted to hire a barmaid, defendant suggested that Mary Ann work there. Mary Ann started working at the Red Rooster in early 1988.

Mary Ann and defendant eventually rented the house on North Whitnall Highway from Gornik. On August 14, 1988, when defendant and Gornik were doing some chores around the property, Gornik said he was upset because a neighboring property, which he also owned, was extremely dirty. Gornik commented that perhaps he would "get lucky and this place will burn down." Gornik then asked defendant to burn down his property, but defendant considered the conversation to be a joke.

Concerning the events of August 14, 1988, defendant testified as follows: Over the course of the day and night, he drank approximately one case of beer. That evening, after he picked up Mary Ann from work, the two went outside to the car, intending to drive to the Silver Moon to check on a job opportunity for Mary Ann. Just then, Hoeck approached and asked to borrow something; defendant became angry, using profanity, because they were in a hurry. Mary Ann called defendant a drunk and drove away, leaving defendant behind. At approximately 7:30 p.m., defendant telephoned the Red Rooster, spoke to Nicholas Snyder, and asked him for a ride to the Silver Moon. About 8:00 p.m., Snyder picked up defendant from his house and drove him to the Silver Moon, where he saw Mary Ann. After drinking two beers, defendant

told Mary Ann he was going home. Defendant walked home. When he arrived, every light in the house was on. Mary Ann had, in the meantime, apparently returned by car. Going inside, defendant saw Mary Ann walking out of the bathroom and into the bedroom. Defendant retrieved a beer from the kitchen, entered the living room, and turned on the television. Mary Ann and defendant argued about where defendant had been and when and where he would sleep. Mary Ann told defendant that if he fell asleep on the couch she would "cut [his] damn balls off with a butcher knife." Defendant yelled in reply, "Why don't you just shut your goddamned mouth and go to sleep."

Defendant then picked up a plastic container of gasoline from the patio and walked approximately 43 feet to the entrance of the bedroom. Mary Ann was sitting on the bed. Defendant threw the plastic container toward Mary Ann, said something to the effect of "you fucking bitch, I hope you burn in hell," lit a Bic brand cigarette lighter, and threw it. There was an explosion. While defendant stood in the doorway, Mary Ann ran past him, on fire. Defendant remained in the doorway a few minutes and then walked out the front door.

While defendant testified that he threw the lighter, he also testified that, for the butane flame of a Bic lighter to remain lit, a button must be continuously depressed. Defendant burned his left arm from the resulting flash when he ignited the fire.

When defendant threw the gasoline and ignited it with the lighter, his only thought was to kill Mary Ann. He did not think about Gornik, the rent due, or the consequences of his actions. At the time of the incident, he felt drunk. If he had been sober, he would not have acted as he did.

Defendant was confused during his police interview, although he attempted to tell the truth. Contrary to defendant's statement to the police, he was not angry with Gornik, Gornik had not suggested he burn the house down, and Gornik's comment about wishing the place would burn down had occurred at least a year before Mary Ann died.

Defendant never worried about Mary Ann leaving him. He was not upset when Mary Ann told him she had a list of battered women's shelters.

Psychologist Bruce Sutkus, Ph.D., examined defendant on July 15 and 17, 1989. Defendant's intelligence quotient (IQ) was 100, which is considered average. Dr. Sutkus performed a series of tests and concluded there was no indication of brain dysfunction. Defendant was generally cooperative.

Dr. Sutkus opined that defendant was egocentric, immature, impulsive, childish, and demanding. Individuals with these characteristics tend to have a

nonintegrated conscience and a history of aggression and assaultive behavior. Males with these characteristics tend to have a high frequency of alcohol-related problems. They tend to be assaultive when they are drunk and to engage in manipulative behavior to escape stressful situations. Impulsiveness is an enduring personality characteristic, and an individual with this characteristic does not look or think before he acts. Imbibing alcohol tends to limit the activity of frontal lobes in the brain, loosening inhibitions and increasing impulsiveness. It is possible for a heavy drinker with a blood-alcohol level of 0.25 or 0.26 percent not to appear outwardly intoxicated. Nevertheless, such an individual would be cognitively impaired.

Dr. Sutkus also opined that defendant was alcohol dependent, meaning that he needed to drink socially on a regular basis to be able to function. In making this determination, Dr. Sutkus considered defendant's erratic work history, his volatile relationship with Mary Ann, which involved heavy drinking by both parties, and his history of cohabitant abuse.

Henry Greenberg, who had worked as a criminalist with the Los Angeles Sheriff's Department for 12 years and owned a private forensic alcohol laboratory in Fountain Valley, testified that ethyl alcohol, commonly found in commercial alcoholic beverages, is a depressant that acts on the brain and spinal column, which comprise the central nervous system. According to Greenberg, alcohol consumption first affects an individual's mental capabilities such as judgment, reasoning, perception, loss of inhibitions, and ability to comprehend, understand, think, and reason. Alcohol consumption next impairs fine motor coordination skills, visual acuity, and speech. It then results in physical impairment, such as balance coordination, gross motor coordination, and total loss of inhibition. The amount of alcohol consumed can become toxic, resulting in death by alcohol poisoning.

Greenberg testified that an average individual with a blood-alcohol level between 0.10 and 0.12 percent would have impaired mental reasoning. An average individual with a blood-alcohol level of 0.25 percent would be significantly impaired, unable to make rational and critical judgment decisions, would lose inhibition, and would show outward signs of impairment or intoxication. Although an individual with a history of alcohol consumption might have a blood-alcohol level of 0.15 or 0.20 percent without showing any outward signs of physical impairment, his mental functions would be affected.

Greenberg opined that if a male individual weighing 165 pounds like defendant committed an act at 9:00 p.m., did not consume any alcohol between then and midnight, and had a blood-alcohol level of 0.25 percent at midnight, his blood-alcohol level at 9:00 p.m. would have been between 0.27 and 0.31 percent. If such an individual began drinking at 9:00 a.m., he would

have had to drink at least 21 beers to reach the assumed blood-alcohol level. Greenberg further opined that no individual is capable of using proper judgment with a blood-alcohol level above 0.20 percent.

### 3. *Rebuttal Evidence*

Bartender Charlene Garcia testified that defendant came into the Red Rooster a week before the fire, upset because Mary Ann was planning to move out. Defendant said, "If she tries to leave me, I'll burn the fucking house down." Defendant also told Garcia that he believed Mary Ann was "running around." Defendant, a regular patron of the Red Rooster, often complained about arguments he had with Mary Ann.

Gertrude Mahoney, Mary Ann's mother, testified that defendant was very possessive of Mary Ann. On August 14, 1988, the day of the fire, Gertrude received 10 to 15 telephone calls from defendant. Defendant became more agitated with each call. During one particular conversation, defendant told Gertrude he thought Mary Ann was seeing someone else. In one of the last telephone calls, defendant mentioned that he was going to the Silver Moon. At approximately 7:00 p.m., worried and scared by the increasing agitation in defendant's voice, Gertrude telephoned Mary Ann at the Silver Moon and told her to come straight to her house.

Winifred Meyer, a psychiatrist, reviewed the materials Dr. Sutkus used to make his evaluation of defendant and the tape of defendant's interview with police. Dr. Meyer found nothing in any of these materials that would indicate defendant was impulsive in character.

The arson investigator testified that it was impossible to have a flash-type explosion by throwing gasoline, lighting a Bic lighter, and throwing the lighter at the gasoline. Had such an explosion occurred, defendant would likely have suffered significant burns to his hands and face, and parts of his clothing also would likely have been burned. When Mary Ann told the arson investigator that she thought she was dying, she also said she had been asleep and felt someone pouring something on her. The arson investigator opined that Mary Ann was either asleep or half asleep in bed when defendant poured a flammable liquid on her back, and that the liquid had then dripped down onto the floor at the edge of the bed, creating one of the two distinct areas where the fire ignited.

Police Officer Roy McIntosh arrested defendant on August 14, 1988, at approximately 10:10 p.m. He did not smell alcohol on defendant, and defendant exhibited no outward signs of being under the influence of alcohol. In December 1987, Officer McIntosh had participated in arresting defendant

for cohabitant abuse against Mary Ann. Mary Ann had a bruise under her right eye and red welts around her neck, consistent with being choked or strangled. At that time, Officer McIntosh could tell defendant had been drinking because defendant showed signs of intoxication such as slurred speech and unsteadiness, and because defendant had the smell of alcohol on his breath.

Police Officer Robert Wantling arrested defendant for cohabitant abuse against Mary Ann in May 1988. Mary Ann had suffered a bruise below her right knee. Defendant stated he had been drinking, and his breath smelled of an alcoholic beverage.

### B. *Penalty Phase*

Neither the People nor defendant introduced any evidence at the penalty phase.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Appointment and Removal of Counsel*

A proper understanding of the issues involving the appointment and removal of defendant's counsel requires that we set forth in some detail the procedural background leading to the trial court rulings defendant challenges.

Defendant was originally represented by the Los Angeles County Public Defender's Office. On December 21, 1989, more than a year after defendant was held to answer on first degree murder and arson charges, the trial court appointed the Alternate Defense Counsel (ADC) to represent defendant because the public defender's office had declared a conflict of interest. On January 31, 1990, Wayne Brandow of the ADC appeared in court as counsel for defendant.

On August 31, 1990, the People announced they were ready for trial. Brandow stated he would be ready toward the end of September 1990. The trial court set the matter for trial and pretrial setting on September 11. Because of the court's scheduling conflicts, the matter was thereafter continued to December 3.

On November 19, 1990, Brandow, who no longer worked for the ADC, requested appointment as defendant's counsel to maintain "continuity of the individual attorney in representation" pursuant to *Harris v. Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750] (*Harris*). At the

hearing on the motion, the trial court considered confidential declarations filed by defendant and Brandow. Defendant declared, inter alia, that: He regarded Brandow, not the ADC, to be his counsel; Brandow had interviewed family members and others in New England who could testify on his behalf; he was confident Brandow, who had previously handled cases involving the death penalty, would represent him well at trial; he did not want new counsel who would need additional time to become familiar with his case when Brandow was already familiar with it; and because Brandow did not have a large caseload, he would be able to devote more time to his matter than attorneys with the public defender's office or the ADC. Brandow declared, inter alia, that: He had been counsel of record for defendant since the court appointed the ADC; he had traveled to Massachusetts and New Hampshire and personally interviewed numerous potential witnesses; an informed decision on which individuals to call as witnesses at trial could be made only by someone who had personally interviewed them and observed their demeanor; many potential witnesses were reluctant to travel to California but might agree to attend proceedings in this matter because he had developed a rapport with them, and such a rapport could be duplicated by different counsel only if such counsel were willing to spend as much time as he had already spent interviewing the witnesses at their homes and places of work; and he was the only counsel with whom defendant had had contact since the ADC was appointed.

Michael Morse of the ADC appeared as counsel for defendant at the hearing on Brandow's motion. Morse represented that the ADC did not have a conflict of interest in continuing to represent defendant, was "neutral" on whether the motion should be granted, and would not oppose a court order replacing the ADC with Brandow as counsel for defendant.

The trial court declined to relieve the ADC as counsel for defendant "based upon the case law and based upon the papers filed."

On December 3, 1990, Philip Nameth of the ADC appeared on behalf of defendant and stated he would be second counsel on the case and that Otha Standifer, also of the ADC, would be lead counsel. Nameth also noted that two potential witnesses in the case had been or were currently in prison and that the ADC might have a conflict of interest. The trial court stated that it would like to be notified as soon as possible if there was a conflict so that it could "advance the matter to appoint private counsel."

Between February and April 1991, the ADC successfully moved to continue the matter several times.

In May 1991, the trial court set October 15, 1991, as the trial date. On October 15, the ADC moved for another continuance, which the People

opposed. The court granted the continuance until January 27, 1992, but stated that would be the last continuance it would grant. On December 6, 1991, the ADC moved for yet another continuance because the case had been reassigned internally to John Daley, even though Otha Standifer remained on the case. The court denied the motion.

On January 13, 1992, the ADC moved for yet another continuance. The trial court denied the motion and stated that voir dire would begin "in earnest" on February 13.

On January 17, 1992, the ADC filed an ex parte motion for a continuance. At an ex parte in camera hearing, Standifer stated that he personally had had defendant's case for only 10 months because the file had not been obtained from previous counsel in a timely fashion, that he was only just beginning to make inroads in obtaining interviews with potential witnesses on the East Coast, and that he could not be ready to try the case earlier than late April. The trial court replied that it could not, in good conscience, grant another continuance and that it might have to relieve the ADC if the ADC could not try the case within the time frame the court contemplated. The court further noted that the hearing on the motion to continue should have taken place in open court, as nothing that counsel said had been confidential. Standifer repeated his arguments in open court, and the People objected to the continuance and requested that the ADC be relieved. The court remarked repeatedly that the ADC had had the case for over two years and that "enough [was] enough." Daley replied, "But there's still no continuity in terms of investigators or lawyers, and that's the hardest thing to do with that."

Following arguments by counsel, the trial court stated: "At this time, now, I will be honest with you. I wish I had relieved you before and appointed Mr. Brandow, who would have been ready a long time ago. [¶] If I made a mistake in this case, that was my mistake. I should have appointed Mr. Brandow and relieved the Alternate Defense Counsel. [¶] . . . [¶] But I didn't do that, because I felt your office would be ready in a reasonable amount of time, and I did not feel it was fair to take the case from your office, because it was your office's case and I don't think your office would have been terribly fond of me if I had taken the case from your office at that time, because one of your members had happened to be relieved at that time, and it was unfair. [¶] But now you've put the court in a very awkward position, and what I will do is as follows: [¶] I will begin—I will agree to begin the jury selection process on March 2nd; one, to help you out; two, to help the court out, because I'm in the middle of a murder trial. [¶] But as far as I am concerned, it's March 2nd. If you cannot be ready on that date, tell me now and I will relieve you. If you can be ready on that date, I'll accept your representations

and I will go from there." Standifer replied, "[I] will try with all my might to be ready by that date." He also stated that if the trial court were unwilling to continue the trial until late April as he requested, he would "request as much time as the court will give [him] before then."

The People objected to the trial court's ruling and noted that the numerous defense continuance motions were not fair to the victim's frail and elderly mother, a crucial witness for the prosecution. The court replied: "I agree you [the People] have rights under 987.5 of the Penal Code and 1050.5 of the Penal Code. I agree with you entirely. But I will accept the representations of counsel [that they will be ready]." The court further stated: "[I] feel I should give Alternate Defense Counsel a chance to be ready. They've been on the case this long. [¶] I think I'll save time by giving them the March 2nd date, and if they cannot be ready at that time [sic]. For ethical reasons I will relieve them at that time. And I think they understand the parameters of my ruling. So I'm going to give you some slack, but that's as far as it's going to go." The court then noted that Attorney Marvin Part was in the courtroom and asked him to be present on March 2, 1992, "just in case [defense] counsel are not ready and cannot proceed in the Cole matter on that date." The prosecutor noted that she would give Part "all of the materials that [she had] so he will be knowledgeable and prepared in this case, because [the ADC] will not be ready."

On February 7, 1992, the ADC made another motion for a continuance, specifically, a two-week continuance with a four-week "hiatus" between the guilt and penalty phases. Defendant indicated he would prefer to be represented by the ADC over Part, but he also renewed his motion under *Harris*, *supra*, 19 Cal.3d 786, to have Brandow appointed as counsel. The trial court again noted that it wished it had "kept Brandow on the case" but that, at this point, Part had already become "involved in the case," and that, if the court relieved the ADC, it would appoint Part as counsel for defendant. After hearing from all counsel, the court "with reluctance" relieved the ADC because it could not be ready in time. In so doing, the court stated: "This case has gone on and on. I feel this case will go on and on unless I do something now, while I am [loath] to do it." Defendant, once again, renewed his *Harris* motion, stating that he had spoken with Brandow and that Brandow was available to handle the case if need be. The court appointed Part as counsel for defendant, but it ruled that the appointment was without prejudice to possibly appointing Brandow on February 18, the next court date, if Part could not be ready to try the case "in a reasonable time."

On February 18, Part appeared as counsel for defendant. The People noted that there was an "absolute" prosecution witness who had been previously represented by the ADC. The trial court stated for the record that it had

relieved the ADC of its appointment because it could not be ready for trial in a reasonable time frame. It further noted that the ADC should have been relieved in any case because it had a conflict of interest in continuing to represent defendant because of its previous representation of a prosecution witness. The court also stated that Brandow had filed a declaration in which he represented, among other things, that: (1) he would be out of town on February 18 and thus would not be able to appear in court; (2) during the 10 months he had represented defendant, Brandow had personally performed out-of-state interviews with potential witnesses and evaluated their suitability as trial witnesses, and viewed physical locations relevant to the defense; (3) when he left the ADC, Brandow "believed that certain things still remained to be done in order to become fully and adequately ready to commence trial"; (4) Brandow did not know what work had been done since December 1990, when he ceased representing defendant, but he believed "it would be necessary to relocate some of the previously interviewed witnesses, regain access to the file and documents which were previously transferred to the [ADC], review the entire file[,] and perform the limited additional preparation" that he had previously planned, with the result that although he "could not unconditionally guarantee" he could be prepared to try the case on March 2, 1992, he was sure no other counsel would be better prepared on that date; and (5) he was currently the counsel of record in two other cases, one of which was a death penalty case then set for preliminary hearing on February 24, 1992, and to commence within 30 days thereof, in which the court had instructed counsel to avoid becoming otherwise engaged, but he believed the preliminary hearing would be continued to a future date.

When the trial court inquired about defendant's own wishes on the matter of counsel, defendant said he would like to have Brandow as counsel because Brandow was more familiar with his case, had spoken to more potential witnesses than any other counsel, and "would be much more prepared to go to trial."

Attorney Part stated that he had already received discovery and begun work on the case and that he would be ready to go to trial on March 16. Part also stated, however, that his three attempts to speak to defendant had been unsuccessful. The first two attempts failed because of a flood and lockdown at the jail. The third attempt, on February 13, failed because defendant had refused to speak to Part. Part said that although defendant's case was "a most serious case and a problem case," it was largely based on "a stipulated set of facts." Part related that previous counsel, specifically the public defender's office and Brandow, had "two excellent investigators" who interviewed potential witnesses on the East Coast and thereafter wrote detailed reports about them. Part stated that he did not believe there would be much difference for him between personally interviewing these potential witnesses and reading the reports and the exhibits. He acknowledged that "voluminous

work" had been done by investigators in this case, but added that he would not use most of that work at trial. Rather, he would "pick and select a few witnesses, not the 30 or 40 or 50 who perhaps were visited, acquaintances at work and school and things like that, that I really tactically think have no reason to be in the case at all." Part believed that if defendant "would listen to what I had to say rather than hanging up the telephone . . . , I could explain my position and he would know that I am firm in his defense."

The trial court ruled that Part would remain as counsel for defendant. It further stated: "While it is true Mr. Brandow has done some work on the case, that was some time in the past. Mr. Part is an excellent lawyer, as is Mr. Brandow, but I believe Mr. Part's statements to me reflect that he will be ready and will do an excellent job in this matter, and will be prepared."

### a. *Refusal to relieve the ADC and appoint Brandow*

Defendant contends the trial court initially erred in denying him continued representation by Brandow, who had left the ADC and requested appointment as private counsel in his case.

"A criminal defendant's right to counsel is guaranteed by both the federal Constitution's Sixth Amendment (applicable to the states through the Fourteenth Amendment), and by the California Constitution article I, section 15. The essential aim 'is to guarantee "an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 256 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

Section 987 provides that the trial court must assign counsel to a capital defendant if he or she is unable to employ counsel. "In Los Angeles County, pursuant to section 987.2, indigent criminal defendants . . . are represented by the public defender. If the public defender is unable to represent a defendant because of a conflict of interest, the alternate defense counsel is assigned to represent the defendant. If the alternate defense counsel is unable to represent a defendant because of a conflict of interest, private counsel is assigned." (*Alexander v. Superior Court* (1994) 22 Cal.App.4th 901, 910 [27 Cal.Rptr.2d 732]; see also § 987.2, subd. (d).) The court may depart from this specific order of appointing counsel for an indigent defendant, however, "[i]n the interest of justice." (§ 987.2, subd. (d).) In such a case, the court must make "a finding of good cause and stat[e] the reasons therefor on the record." (*Ibid.*)

On appeal, a trial court's orders concerning the appointment of counsel for an indigent defendant are reviewed for abuse of discretion. (See,

e.g., *People v. Horton* (1995) 11 Cal.4th 1068, 1098 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *Harris, supra,* 19 Cal.3d 786, 799.) A court abuses its discretion when it acts unreasonably under the circumstances of the particular case. (See *Harris, supra,* at p. 796.)

In *Drumgo v. Superior Court* (1973) 8 Cal.3d 930 [106 Cal.Rptr. 631, 506 P.2d 1007], prior to the date for appointing counsel, the indigent petitioner sought and was granted permission to consult with private counsel. He thereafter requested appointment of that counsel, who, in turn, advised the trial court that he was ready, willing, and able to proceed as appointed counsel. The court denied the petitioner's request and appointed a different attorney. (*Id.,* at pp. 932–933.) The petitioner later moved to relieve counsel and to appoint the attorney he had originally requested. In support of the motion, the petitioner stated that he knew and had confidence in his requested counsel, and that he did not know, did not have such confidence in, and thus would not cooperate with, appointed counsel. The court denied the motion. (*Ibid.*) When the petitioner sought review of this decision, we denied relief, explaining that the petitioner had "not met the heavy burden imposed in stating a claim for relief cognizable on mandate." (*Id.,* at p. 933.) Citing section 987, we stated that *the court* assigns counsel to an indigent defendant, and that "constitutional and statutory guarantees are not violated by the appointment of an attorney other than the one requested by defendant." (*Drumgo, supra,* at p. 934.) We also noted that requested counsel's readiness, willingness, and ability to act did "not raise any constitutional compulsion requiring his appointment." (*Ibid.*)

In contrast to *Drumgo v. Superior Court, supra,* 8 Cal.3d 930, we held in *Harris, supra,* 19 Cal.3d 786, that the trial court's refusal to appoint requested counsel for certain indigent defendants amounted to an abuse of discretion. When the two petitioners in *Harris,* who were charged with multiple felony violations, first appeared in court and were advised that they were entitled to appointed counsel because the public defender was burdened with a conflict of interest, the petitioners requested the same two attorneys who had been appointed to represent them in municipal court proceedings on the same matter. The court declined and appointed different attorneys. Among the factors considered by the court in making the appointments were the respective reputations of appointed counsel among the local bench and bar, their experience in the trial of similarly serious cases, and their certifications by the State Bar as criminal law specialists. The petitioners objected to the appointments, noting they had developed a relationship of trust and confidence with their requested counsel. (*Id.,* at pp. 788–790.) At the arraignment, all counsel joined in petitioners' request, but the court ultimately reaffirmed its prior order. (*Id.,* at pp. 790–794.)

When the petitioners sought review of the trial court's order by writ (*Harris, supra*, 19 Cal.3d 786, 789), we held that the court's refusal to appoint requested counsel was an abuse of discretion. In so concluding, we found significant that requested counsel had previously represented the petitioners in related prosecutions, which had established a close working relationship between counsel and petitioners and also given counsel extensive background in factual and legal matters that might become relevant in the current proceeding. We also found significant that appointed counsel vigorously supported the petitioners' plea that they not be appointed, emphasizing their relative unfamiliarity with the factual and legal issues involved and the necessity for expending considerable time and energy if they were to bring their level of familiarity with the case up to that of requested counsel. (*Id.*, at pp. 797–799.) We thus reaffirmed "the basic holding of *Drumgo* [*v. Superior Court, supra*, 8 Cal.3d 930,] that the court's discretion in the appointment of counsel is not to be limited or constrained by a defendant's bare statement of personal preference, [but] . . . that when that statement of preference, timely made, is supported by objective considerations of the consequence here involved, and where there are no countervailing considerations of comparable weight, it is an abuse of sound judicial discretion to deny the defendant's request to appoint the counsel of his preference." (*Id.*, at p. 799.)

The People argue that *Harris, supra*, 19 Cal.3d 786, is applicable only where the public defender (including the ADC) is unavailable and the court must for that reason choose between private counsel. In support of their position, the People point to *Charlton v. Superior Court* (1979) 93 Cal.App.3d 858 [156 Cal.Rptr. 107] and *Williams v. Superior Court* (1996) 46 Cal.App.4th 320 [53 Cal.Rptr.2d 832], in which courts interpreted the trial court's statutory authority to appoint private counsel when the public defender is unavailable (see § 987.2, subd. (d)) as precluding appointment of such counsel when the public defender is available. In *People v. Daniels* (1991) 52 Cal.3d 815, 844–845 [277 Cal.Rptr. 122, 802 P.2d 906], we acknowledged that uncertainty existed on the question whether *Harris*, which permits discretionary appointment of counsel for indigent criminal defendants, was applicable to situations where the public defender was available for appointment. Ultimately, however, we declined to address the question because the facts presented in *Daniels* were factually distinguishable both from *Harris* and from the situation where a defendant is unable to cooperate with the available public defender.

We similarly decline to address the question here. Brandow's request for appointment was based on the considerations that he had personally interviewed and developed rapport with numerous potential witnesses, that different counsel could duplicate such rapport only by expending considerable time interviewing and otherwise spending time with these potential witnesses, and

that he was the only counsel with whom defendant had had contact at the ADC. In support of Brandow's request, defendant declared he was confident that Brandow, who had interviewed family members and other potential witnesses and had previously handled capital cases, would represent him well at trial. Defendant also stated that he did not want a new attorney who was unfamiliar with his case and would require additional time to become as familiar with it as Brandow already was, and that Brandow could devote more time to his case than the ADC because of a lighter caseload. Nothing in the record before us, however, demonstrates that the relationship between defendant and Brandow ever approached the depth of the relationship between the petitioners and their requested counsel in *Harris, supra,* 19 Cal.3d 786. And, unlike the appointed counsel in *Harris,* the ADC did not actively seek to withdraw as counsel or support Brandow's appointment. Furthermore, there is no showing that defendant disagreed with the ADC as to trial tactics or any other aspect of his defense in such a way that he could not cooperate with the ADC. Under these circumstances, the trial court's denial of Brandow's motion for removal of the ADC and appointment of him as counsel in its place constituted a proper exercise of discretion. That the court later regretted its ruling is no indication that the ruling made at the time was improper.[1]

### b. *Removal of the ADC as counsel*

Next, defendant contends the trial court erred in relieving the ADC as counsel.

Generally, it is either the defendant or his counsel who requests the removal of counsel. (*People v. McKenzie* (1983) 34 Cal.3d 616, 629 [194 Cal.Rptr. 462, 668 P.2d 769], limited on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [121 Cal.Rptr.2d 580, 48 P.3d 1136]; see also *Smith v. Superior Court* (1968) 68 Cal.2d 547, 558–559 [68 Cal.Rptr. 1, 440 P.2d 65]; Code Civ. Proc., § 284.) Counsel may also be relieved on the trial court's own motion, over the objection of the defendant or his counsel, "to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings." (*People v. McKenzie, supra,* at p. 629.) On appeal, a trial court's removal of counsel for an indigent criminal defendant is reviewed for abuse of discretion. (See, e.g., *People v. Daniels, supra,* 52 Cal.3d 815, 846–847.)

---

[1] Defendant claims that the trial court's asserted error in denying Brandow's motion for appointment violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and his right to a reliable conviction and sentence under the Eighth Amendment to that Constitution. The point fails because, as we have concluded, the court's denial of the motion was not erroneous. The predicate of defendant's claim of federal constitutional error is the existence of state law error. In the absence of state law error, the claim of federal constitutional error falls of its own merit.

Added by Proposition 115 in 1990, article I, section 29 of the California Constitution provides, "In a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial." (See also *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 286, 299 [279 Cal.Rptr. 592, 807 P.2d 434].) Section 987.05, also added by Proposition 115, provides in pertinent part that "In cases where counsel, after making representations that he or she will be ready for . . . trial, and without good cause is not ready on the date set, the court may relieve counsel from the case and may impose sanctions upon counsel . . . ."[2] Additionally, section 1050, which predates Proposition 115, provides, in pertinent part, that "the people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of justice."

▇ Under the circumstances of this case, we conclude the trial court did not abuse its discretion in relieving the ADC as counsel of record. A court may remove appointed counsel both to "prevent substantial impairment of court proceedings" (*People v. McKenzie, supra,* 34 Cal.3d 616, 629) and when counsel, without good cause, does not become ready for trial (§ 987.05). The court in this case, before removing the ADC, granted several defense motions for continuances and allowed some flexibility in terms of the start of jury selection. Furthermore, as early as October 1991, the court had warned that it would not entertain any more defense continuance motions, noting that the ADC had been counsel of record for over two years and that the People also had a right to a speedy trial. Given the ADC's numerous requests for continuances despite the court's warning that it would not grant any further continuances, the skepticism with which the court undoubtedly viewed the ADC's latest assurances of a March 13 readiness date was not unreasonable. Even those assurances were predicated on the ADC's request for a four-week hiatus between the guilt and penalty phases.[3]

c. *Appointment of Part as counsel*

As stated, on February 7, 1992, the trial court relieved the ADC and appointed Part as counsel for defendant, but without prejudice to possibly

---

[2] These provisions added by Proposition 115, namely article I, section 29 of the California Constitution, and section 987.05, address the conduct of trials and, as such, apply to defendant's trial even though the offenses in question predated their passage. (See *Tapia v. Superior Court, supra,* 53 Cal.3d 282, 299.)

[3] Defendant claims the trial court's asserted error in relieving the ADC violated unspecified rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution. The point fails because, as we have concluded, the court's ruling was not erroneous.

appointing Brandow on the next court date if Part could not be ready to try the case in a reasonable period of time. Defendant contends that the court erred in failing to appoint Brandow in place of Part.

As stated, we review a trial court's appointment of counsel for an indigent criminal defendant for an abuse of discretion.

The trial court's ruling that Part would remain counsel for defendant was not an abuse of discretion under the circumstances of this case, notwithstanding the fact that Part had been defendant's counsel for only 38 days when trial began. Part indicated he had reviewed the voluminous materials in the case, including detailed investigation reports, and that he would be ready for trial on March 16. Part did not indicate that he needed to perform additional investigation; indeed, his trial strategy involved offering a few select witnesses at trial. He was "firm" in defendant's defense. In comparison, Brandow's availability and readiness for trial by the appointed trial date were uncertain. He needed to access and review the entire file and perform additional preparation for trial, including locating some previously interviewed potential witnesses, and he could not guarantee he could be ready for trial on March 2. Further, he was under order from the court in another case to avoid becoming otherwise engaged. Although Brandow previously had a 10-month working relationship with defendant, that relationship effectively ended when he left the ADC in 1990, and Brandow was unfamiliar with any investigation or trial preparation that had occurred after that time. Moreover, defendant's reluctance to speak to Part was largely based on his desire to have Brandow as counsel and his belief that the prosecutor had selected Part, rather than any purported failings in representation by Part. Under these circumstances, the court did not act unreasonably in declining to appoint Brandow over Part.

■ Defendant argues that the trial court appointed Part without determining whether he was qualified to handle a capital case and without complying with statutory suggestions for assigning private counsel (see § 987.2, subd. (c)).[4] The record is silent on whether Part was a county-contracted panel attorney. Even if he was not, section 987.2, subdivision (c) does not require the appointment of panel attorneys, and the trial court had no reason to believe that Part was unable to represent defendant competently. Indeed,

---

[4] Section 987.2, subdivision (c) provides in pertinent part: "In counties that utilize an assigned private counsel system as either the primary method of public defense or as the method of appointing counsel in cases where the public defender is unavailable, the county, the courts, or the local county bar association working with the courts are encouraged to do all of the following: [¶] (1) Establish panels that shall be open to members of the State Bar of California. [¶] (2) Categorize attorneys for panel placement on the basis of experience. [¶] (3) Refer cases to panel members on a rotational basis within the level of experience of each panel, except that a judge may exclude an individual attorney from appointment to an individual case for good cause."

stating that Part was a "very fine attorney," the court noted that Part recently had defended a murder case before it and obtained for his client a second degree murder conviction in a case the court believed should have been first degree murder. Our decision in *In re Avena* (1996) 12 Cal.4th 694 [49 Cal.Rptr.2d 413, 909 P.2d 1017] is of no assistance to defendant. There, we denied relief on habeas corpus to a petitioner who had raised claims of ineffective assistance against Part, who had represented the petitioner at a capital trial that took place in November 1981 through February 1982. (*Id.*, at pp. 721–739; *id.*, at pp. 741, 743 (dis. opn. of Mosk, J.).) That a petitioner in an unrelated capital case raised claims of ineffective assistance against Part based on his performance in 1982 has no obvious bearing on the question whether the court in this case abused its discretion in appointing Part as counsel for defendant in 1992.

### 2. *Denial of Marsden Motion*

On March 25, 1992, defendant moved to relieve Part as counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*). Following a hearing on the matter, the trial court denied the motion. Defendant argues the court erred in denying the motion because it failed to inquire fully into his complaints and failed to recognize there was a complete breakdown of the attorney-client relationship. We disagree.

When a defendant seeks discharge of his appointed counsel on the basis of inadequate representation by making what is commonly referred to as a *Marsden* motion, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of counsel's inadequacy. (*People v. Smith* (2003) 30 Cal.4th 581, 604 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683]; see *Marsden, supra,* 2 Cal.3d 118, 123–126.) "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Jones* (2003) 29 Cal.4th 1229, 1244–1245 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Earp* (1999) 20 Cal.4th 826, 876 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

We review a trial court's decision declining to discharge appointed counsel under the deferential abuse of discretion standard. (*People v. Jones, supra,* 29 Cal.4th 1229, 1245.)

Defendant's written declaration in support of his motion stated as follows: (1) Part visited defendant in county jail only four times in February—three times for approximately 30 minutes and once for less than five minutes—and

he had not seen Part since then except in court; (2) Part dismissed an investigator who had been working on the case since its inception and hired another investigator, who had visited defendant only twice for short periods; (3) although Brandow made extensive arrangements for use of expert testimony in the guilt and penalty phases, Part told defendant that to use a psychiatric expert would be "useless" and that the prosecutor would "just chew [such an expert] up"; (4) Part told defendant he would use an "ex-cop" to testify about the effects of intoxication; (5) Part told defendant that his case "was nothing but a simple murder and he would treat it as such"; (6) Part did not plan to present any witnesses in the penalty phase other than defendant; (7) neither Part nor his new investigator had interviewed any potential witnesses; and (8) the prosecutor purportedly chose Part, and this impropriety should, in and of itself, result in his removal.

Part addressed defendant's complaints as follows: (1) He had visited defendant four or five times in jail, had seen him in the holding cell, had visited him as recently as the day before, and had spoken to him "I don't know how many times"; (2) a mitigation expert was no longer on the case because of a ruling made by a different court, and Part believed defendant "held that against [him]"; (3) a psychologist had made an evaluation of defendant regarding specific intent or ability to deliberate at the time of the victim's death, and, although the psychologist had "great credentials," he would "fear to put the man on the stand" on the issue of his opinion of defendant; (4) the only expert witness Part would need at trial was someone who could explain the significance of a 0.26 to 0.30 percent blood-alcohol level, and he was endeavoring to obtain what he considered to be the best expert—someone who had worked in law enforcement; (5) there were some legal issues related to defendant's taped statement, but the case-in-chief was otherwise "quite simple"; and (6) Part acknowledged there had been much work done by prior counsel and his investigator involving interviews with many potential witnesses in preparation for the penalty phase, but he would not "parade them to the witness stand" because it would be difficult to identify who would be favorable to defendant, stating for example, that defendant's father "would probably be a better witness for the prosecution than he would be for the defense." Part stated he was fully prepared for trial, and he detailed some of his trial strategy, explaining that if defendant were to be found guilty of first degree murder with a special circumstance, he would emphasize defendant's lack of a criminal record but for two misdemeanors against the victim. He noted that defendant did not like him, had walked out on him many times, and was not very helpful.

When the trial court inquired if defendant had anything further to say, defendant stated the following: (1) Part's five-minute visit the previous day consisted of Part's statement that approximately 15 prospective jurors were opposed to the death penalty, one woman's spouse was a prosecutor, and one

man was a former homicide detective; (2) Part stated he wanted defendant to testify, without asking defendant for his opinion; and (3) Part did what he wanted to do "without asking [defendant] anything, like he knows it all."

Part responded that he had done a great deal of work, spending as much as 30 hours analyzing the jury questionnaires so that defendant could receive "a fair shake," and that he did not need defendant's opinion or advice to pick the jury. Part added that, under the circumstances, it was necessary for defendant to testify, although he could not force defendant to do so. Part stated he was doing what he believed was best for defendant to exonerate him to the extent possible, he was sorry if defendant did not agree with his strategy, and he would try the case regardless of whether defendant testified.

The trial court clarified for the record that the decision to appoint Part as counsel for defendant was made solely by the court. The court added that Part was an outstanding attorney, he had a reputation among prosecutors as a respectable attorney who obtained results for his clients, and that it could think of no better counsel in this case. The court thereafter denied the *Marsden* motion.

█ Under the totality of the circumstances, we find no abuse of discretion. First, "the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence." (*People v. Silva* (1988) 45 Cal.3d 604, 622 [247 Cal.Rptr. 573, 754 P.2d 1070].) Second, defendant's complaints regarding Part's purported inadequate investigation, trial preparation, and trial strategy were essentially tactical disagreements, which do not by themselves constitute an "irreconcilable conflict." (*People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754].) █ Indeed, a "defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*Id.*, at p. 728.) "Nothing in the record here shows that [Part] was incompetent or would not provide adequate representation if he received defendant's cooperation." (*People v. Michaels* (2002) 28 Cal.4th 486, 523 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Rather, defendant's complaints mostly show disagreement as to tactics, which, by itself, is insufficient to compel discharge of appointed counsel. (See *People v. Smith, supra,* 30 Cal.4th 581, 606.) As we have stated, "the trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*Ibid.*) Such appears to be the case here.

We therefore conclude that the court did not act unreasonably in denying the *Marsden* motion.[5]

B. *Guilt Phase Issues*

1. *Purported Erroneous Admission of Evidence*

a. *Two prior incidents of abuse against the victim*

Prior to trial, the trial court conducted a hearing on the admissibility of evidence that defendant had committed ohabitant abuse against Mary Ann on two prior occasions. Over defendant's objections, the court ruled that the evidence was admissible under Evidence Code section 1101, subdivision (b) to prove a fact at issue on a theory of murder by torture, specifically, intent to torture, and that Evidence Code section 352 did not otherwise limit its admissibility.

At trial, the parties stipulated that defendant had twice been convicted of cohabitant abuse, as a misdemeanor, against Mary Ann, in December 1987 and in May 1988. In the audiotaped police interview of defendant, which was played for the jury, defendant stated at one point that he had been arrested twice for incidents involving Mary Ann, had been released from jail two months earlier, and had been placed on probation for two years.

Later, on cross-examination, defendant testified that in December 1987 he slapped Mary Ann once or twice but did not drag her by her hair across the room, and he further stated that he released his pent-up anger by hitting her. Also on cross-examination, defendant said that in May 1988 he was angry and slapped Mary Ann, and that he had "a tendency to hit with the heels of [his] hand." He testified he hit her but did not recall on what part of her body the blows fell. He then inconsistently testified that he did not recall hitting her.

In rebuttal, Officer McIntosh testified that he had arrested defendant for cohabitant abuse in December 1987 and that, on that occasion, Mary Ann had a bruise under her right eye and red welts around her neck, which were consistent with having been choked or strangled. Defendant exhibited symptoms of being under the influence of alcohol. Similarly, Officer Wantling

---

[5] Defendant claims that the trial court's asserted error in denying his *Marsden* motion violated his right to effective assistance of counsel under article I, section 15 of the California Constitution and the Sixth Amendment to the United States Constitution, his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and his right to reliability of sentence under the Eighth Amendment to the United States Constitution. The point fails because, as we have concluded, the court's denial of his motion was not erroneous.

testified he arrested defendant for cohabitant abuse against Mary Ann in May 1988 and that, on that occasion, Mary Ann had a bruise below her right knee. Defendant smelled of an alcoholic beverage and told the officer he had been drinking.

■ Defendant contends the trial court erred in admitting evidence of prior cohabitant abuse and allowing the parties to stipulate that defendant had been twice convicted of that crime. Such evidence, defendant argues, was irrelevant (see Evid. Code, §§ 350, 351), and if relevant, was unduly prejudicial (see *id.*, § 352) and constituted impermissible character evidence (see *id.*, § 1101, subd. (a)). The heart of defendant's contention is that his prior cohabitant abuse against Mary Ann was not sufficiently similar to support the inference that he probably harbored the same intent—intent to torture—in both instances. Intent to torture, which is a required element in murder by torture and the torture-murder special circumstance (see *People v. Davenport* (1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861]), has been variously described as intent to inflict or cause "extreme pain" (*People v. Bemore* (2000) 22 Cal.4th 809, 841 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Crittenden* (1994) 9 Cal.4th 83, 140 [36 Cal.Rptr.2d 474, 885 P.2d 887]), "extreme and prolonged pain" (*People v. Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665]; accord, *People v. Raley* (1992) 2 Cal.4th 870, 888 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899]), and " 'cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose' " (*People v. Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881]; accord, *People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659]; *People v. Davenport, supra*, 41 Cal.3d at p. 267). In short, we refer to the intent to torture as the intent to inflict extreme pain.

■ Evidence Code section 1101, subdivision (a) generally prohibits the admission of a prior criminal act against a criminal defendant "when offered to prove his or her conduct on a specified occasion." Subdivision (b) of the statute, however, provides that such evidence is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . . )." To be admissible to show intent, "the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance." (*People v. Yeoman* (2003) 31 Cal.4th 93, 121 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; accord, *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Moreover, to be admissible, such evidence " ' "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." ' " (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392]; accord, *People v. Daniels, supra*, 52 Cal.3d

815, 856.) Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (See *People v. Ewoldt, supra,* at p. 404; Evid. Code, § 352.)

We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352. (See *People v. Heard* (2003) 31 Cal.4th 946, 973 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Crittenden, supra,* 9 Cal.4th 83, 134, 36 Cal.Rptr.2d 474, 885 P.2d 887; accord, *People v. Brown* (2003) 31 Cal.4th 518, 534 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Lewis, supra,* 25 Cal.4th 610, 637.)

Assuming, for the sake of argument, that the trial court abused its discretion in admitting evidence of defendant's prior crimes, the error would not require reversal. Even if the two prior instances of criminal abuse are disregarded, there was abundant testimony that defendant's relationship with Mary Ann was acrimonious and that they fought constantly, both verbally and physically. Moreover, as will be discussed, defendant's actions and statements on the day of the fire provided evidence that he intended to torture her. Accordingly, it is not reasonably probable that a result more favorable to defendant would have resulted had the prior crimes evidence not been admitted. (*People v. Welch, supra,* 20 Cal.4th 701, 750; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) For the same reasons, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1120, fn. 23 [36 Cal.Rptr.2d 235, 885 P.2d 1].)[6]

---

[6] For the first time on appeal, defendant claims that the trial court's asserted error in admitting evidence of his prior cohabitant abuse of Mary Ann violated his right to due process under the Sixth and Fourteenth Amendments to the United States Constitution and his right to a reliable verdict under the Eighth Amendment to that Constitution. We believe that to consider defendant's federal claims on the merits is "more consistent with fairness and good appellate practice than to deny the claim as waived. As a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal." (*People v. Yeoman, supra,* 31 Cal.4th 93, 117; see also *id.,* at p. 133.) But the federal claims fail on the merits because, as we have concluded, any error was harmless.

Defendant also contends that evidence of the prior cohabitant abuse convictions purportedly offered to prove the underlying facts was inadmissible hearsay under *People v. Wheeler* (1992) 4 Cal.4th 284, 297–300 [14 Cal.Rptr.2d 418, 841 P.2d 938]. Defendant did not make a specific and timely objection on the ground of hearsay below. No complaint may therefore be made. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 204, fn. 14 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In any event, the parties stipulated that defendant was twice convicted of cohabitant abuse, and neither party offered the convictions to prove the underlying facts.

b. *Victim's suffering prior to death*

Prior to trial, defendant requested an evidentiary hearing to determine the extent to which Dr. Davies, the surgeon who treated Mary Ann until she died, could testify about her suffering. Although the defense acknowledged that commission of an act calculated to cause extreme pain was an element of the torture-murder special circumstance, defense counsel argued that testimony of eight to 10 days of such pain was irrelevant to prove murder by torture and unduly prejudicial as proof of the torture-murder special circumstance. Over defendant's objections, the trial court ruled that Dr. Davies could testify as to Mary Ann's suffering, stating such evidence was "extremely relevant to the issue of proving the torture/murder special circumstance," and that "its probative value outweigh[ed] any prejudice under [section] 352 of the Evidence Code."

At trial, Dr. Davies testified extensively about external and internal injuries to Mary Ann, the deteriorating condition of her body from the time she was admitted until she died 10 days later, various medical treatments administered to treat her burns, her continuing pain and agitation from her injuries and treatments until she lost consciousness on approximately her seventh day of hospitalization, and medication administered to relieve her pain. He opined that had Mary Ann survived, she would have required, at the least, amputation of her hands and feet.

In addition, Nurse Mary Justus further testified about Mary Ann's agitation, pain, and fear in the first four to five days when she was still conscious. Other prosecution and defense witnesses also described Mary Ann's condition immediately after the fire, albeit to a much lesser degree.

Defendant contends that the trial court erred in admitting evidence of Mary Ann's suffering because such evidence was irrelevant at the guilt phase and that, even if relevant, it should have been excluded as unduly prejudicial under Evidence Code section 352.

As stated, we review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352.

 At the time defendant committed his crimes, commission of an act calculated to cause extreme pain no matter how long its duration was an element of the torture-murder special circumstance. (See *People v.*

*Davenport, supra,* 41 Cal.3d 247, 271.)[7] In light of evidence that defendant deliberately poured a flammable liquid on two distinct places, told Mary Ann as he set fire to the liquid that he hoped she would burn in hell, and his subsequent statements that he wanted to kill her, evidence that Mary Ann suffered extreme pain was relevant to prove defendant committed an act calculated to cause extreme pain. Evidence that Mary Ann suffered extreme pain also was part of the circumstances of the crime relevant to prove intent to torture, both for murder by torture and the torture-murder special circumstance. (See *People v. Davenport, supra,* at p. 271; see also *People v. Morales* (1989) 48 Cal.3d 527, 559 [257 Cal.Rptr. 64, 770 P.2d 244].)

██ In addition, the trial court acted within its broad discretion in admitting evidence of Mary Ann's suffering because the probative value of the evidence presented was not substantially outweighed by its prejudicial effect. The "prejudice" referred to in Evidence Code section 352 is "evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Crittenden, supra,* 9 Cal.4th 83, 134.) Graphic evidence in murder cases is always disturbing and never pleasant. (See *ibid.*) Although the evidence of Mary Ann's suffering was indeed disturbing, it was not unduly shocking or inflammatory, especially considering that proof of the torture-murder special circumstance required evidence of commission of a kind of act calculated to cause extreme pain, and that both murder by torture and the torture-murder special circumstance required evidence of intent to inflict extreme pain.[8]

### c. *Victim photographs*

At a pretrial hearing, the prosecutor proffered three photographs of Mary Ann before the fire and nine photographs of her after the fire. Defendant objected to the photographs of Mary Ann before the fire as irrelevant and cumulative, and to the quantity of photographs depicting Mary Ann's burns after the fire as irrelevant and, if relevant, unduly prejudicial and cumulative.

---

[7] Proposition 115, effective June 6, 1990, amended section 190.2, subdivision (a)(18) by deleting the second sentence, which had read: "For the purposes of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration." This amendment, however, does not apply to crimes, like that here, committed before Proposition 115 was passed. (*People v. Bemore, supra,* 22 Cal.4th 809, 839 & fn. 17.)

[8] For the first time on appeal, defendant contends the assertedly erroneous admission of evidence of Mary Ann's suffering at the guilt phase violated the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and undermined the reliability required for a conviction under the Eighth and Fourteenth Amendments to that Constitution. Considering defendant's federal claims on their merits (see *People v. Yeoman, supra,* 31 Cal.4th 93, 117, 133), we find they fail because, as we have concluded, the evidence was properly admitted.

The trial court permitted the prosecutor to admit one photograph of Mary Ann before the fire and all nine photographs of her after the fire, stating that, with regard to the photographs depicting her burns, each was taken "from a different perspective" and their "probative value outweighs undue prejudice as to the issues to be proven in this case."[9]

On appeal, defendant challenges the photograph of Mary Ann before the fire as irrelevant and the nine photographs of her after the fire as irrelevant and, if relevant, as unduly prejudicial and cumulative.

As we shall explain, defendant's challenge is without merit.

We review the trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352, including photographic evidence, for abuse of discretion. (See *People v. Martinez* (2003) 31 Cal.4th 673, 692 [3 Cal.Rptr.3d 648, 74 P.3d 748]; accord, *People v. Medina* (1995) 11 Cal.4th 694, 755 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Defendant argues that the photograph of Mary Ann before the fire was irrelevant, and therefore inadmissible, because it "had no bearing on any contested issue in the case." (*People v. Ramos* (1982) 30 Cal.3d 553, 578 [180 Cal.Rptr. 266, 639 P.2d 908].) We disagree. Whether defendant intended to inflict extreme pain and to commit an act calculated to cause such pain were two important issues at trial relating to the torture-murder special circumstance. Intent to inflict such pain was also relevant to the charge of murder by torture. Accordingly, the photograph of Mary Ann before the fire was relevant to show the extent of the harm caused by defendant's actions. We thus conclude the trial court did not abuse its discretion in admitting a single photograph of Mary Ann before the fire.[10]

Defendant also argues that the nine photographs of Mary Ann after the fire were irrelevant to the issue of intent to inflict extreme pain, cumulative to testimonial evidence, partly cumulative to each other, and unduly prejudicial. His challenge to these photographs on the ground of relevance has not been preserved for review because he did not make a specific and timely objection

---

[9] Of the nine photographs depicting Mary Ann's wounds, one was later completely destroyed and four were severely damaged by flood after the trial concluded.

[10] Although defendant did not make a specific and timely objection on these grounds at trial, he now contends on appeal that the assertedly erroneous admission of the photograph of Mary Ann taken before the fire violated his rights to a fair trial under the Fifth Amendment, an impartial jury under the Sixth Amendment, and due process and "heightened capital case due process" under the Eighth and Fourteenth Amendments to the United States Constitution. Considering these claims on the merits despite defendant's procedural default (see *People v. Yeoman, supra,* 31 Cal.4th 93, 117, 133), we conclude they fail because the photograph was properly admitted.

on this ground. (See *People v. Alvarez, supra*, 14 Cal.4th 155, 204, fn. 14.) In any event, he fails on the merits because, as we will discuss, the photographs were indeed relevant.

The intent to inflict extreme pain may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. (*People v. Morales, supra*, 48 Cal.3d 527, 559.) The photographs of Mary Ann, which depicted the numerous burns on specific parts of her body, were obviously relevant to show the condition of her body as it related to the issue of intent to inflict extreme pain, as well as to prove commission of a kind of act calculated to cause such pain.

Further, we have often rejected the argument that photographs of a murder victim should be excluded as cumulative to other evidence in the case. (*People v. Heard, supra*, 31 Cal.4th 946, 976, 978; *People v. Martinez, supra*, 31 Cal.4th 673, 692; *People v. Gurule* (2002) 28 Cal.4th 557, 625 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

We cannot conclude that the trial court abused its discretion in admitting the photographs. As we have previously observed, all photographs of murder victims are disturbing. (See *People v. Heard, supra*, 31 Cal.4th 946, 976.) Here, although the photographs are "unquestionably unpleasant" (*id.*, at p. 977), they are not unduly gruesome or inflammatory and, as previously noted, are all relevant to issues in the case. Moreover, the trial court ruled that the photographs were sufficiently different as not to be cumulative to each other, and such a ruling is not unreasonable. The trial court did not abuse its discretion in admitting these photographs.

Even if we were to agree with defendant that the trial court erred in admitting one or more of the autopsy photographs, we nonetheless would conclude that any error was harmless under the standard of *People v. Watson, supra*, 46 Cal.2d 818. Under *Watson*, the erroneous admission of photographs warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had such evidence been excluded. (*People v. Heard, supra*, 31 Cal.4th 946, 978; see *People v. Watson, supra*, at p. 836.) The photographs here "did not disclose to the jury any information that was not presented in detail through the testimony of witnesses," and they were "no more inflammatory than the graphic testimony provided by a number of the prosecution's witnesses." (*People v. Heard, supra*, at p. 978.) Under these circumstances, it is not reasonably probable that the admission of the nine photographs of Mary Ann after the fire, which depicted her burns and injuries, affected the jury's verdict. (*Ibid.*) And for the reasons stated, we would also conclude that any error was harmless beyond a reasonable doubt. (See *Chapman v. California, supra*, 386 U.S. 18, 24.)

### 2. Prosecutorial Misconduct

Defendant contends that the prosecutor committed misconduct during his guilt phase closing argument by comparing defendant's conduct to the Spanish Inquisition and persecution of early Christians, and by impugning the integrity of defense counsel. We review the various statements of asserted misconduct in some detail below and conclude that defendant has forfeited the claim for failure to object or request an admonition to any of the statements, and that in any event the claim lacks merit.

#### a. Relevant proceedings

As an illustration to explain murder by torture, the prosecutor argued that during the Spanish Inquisition, suspected heretics were tortured and killed. The prosecutor then continued: "The night before, after months, sometimes years, one of these acts of faith when somebody was going to be executed, they would give them the opportunity one last time, although it wasn't really a last time, to confess and turn over their friends. This might be after six months of unbelievable torture. They knew they were going to die.

"If they confessed at this point in time and turn[ed] people over, a mercy was done them. They were allowed to be garroted right then and there, strangled so that only their dead body would be burned at the stake the next day, and they wouldn't have to face the flames and the pain of burning. They could be dead first. This is after months of torture of not confessing.

"Hundreds, thousands of them at the last minute, either the night before, or actually some of them the next day after they were marched out, right when they were about to be taken to the stake, there was one more time, even though they were told the night before, 'this is the last time, confess now and we'll strangle you and you won't have to face the flames,' and they did, because they had seen it.

"There was nothing—there is nothing you can plan, there is nothing in the human psyche that is as terrifying as dying by burning, and these are people who were going to die while tied up to the stake, and the whole thing is going to take ten minutes.

"Doesn't compare to what Mary Ann Mahoney went through. Doesn't even come close. They were allowed to be strangled first.

"I'm not suggesting to you that Stephen Cole knew the history of the Inquisition. This is an experience. This was a relationship with fire that underlines man's relationship with fire throughout history. A little child burns

his finger and knows. You cannot imagine any death—make one up—tie somebody up in the desert, put them up there in the heat up to their neck until the ants eat them up. Doesn't compare to what he did to Mary Ann Mahoney. And when you use fire, you know it, we all do.

"Frankly, there is a movie on—a famous movie, Quo Vadis, the other night. I don't want to get into religious areas, but I've got to tell you, when they were crucifying the early Christians, some of the pain wasn't enough, they had to light them on fire to really do it. We know what fire does."

At the start of his rebuttal argument, the prosecutor noted that defense counsel mentioned him by name over 35 times and referred to the "prosecution" over 125 times. He argued that many of defense counsel's references to evidence were incorrect or taken out of context and that, unlike defense counsel, he would argue what he believed was a fair characterization of the evidence. The prosecutor subsequently argued at various points that defense counsel was attempting to "mislead," "deceive," or give the "wrong idea" to, the jury; was "sneaky"; was "unfair" to the jury and to the characterization of evidence and the law; and "wasn't being straight" with the jury.

Defendant did not object to any of the purported instances of misconduct.

b. *The claim was not preserved for appellate review*

To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673]; accord, *People v. Brown, supra*, 31 Cal.4th 518, 553.) A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile. (*People v. Hill, supra*, at p. 820.) In addition, the failure to request that the jury be admonished does not forfeit the issue for appeal if an admonition would not have cured the harm caused by the misconduct or the trial court immediately overrules an objection to alleged misconduct such that the defendant has no opportunity to make such a request. (*Id.*, at pp. 820–821.)

As for the comments about the Spanish Inquisition and the persecution of early Christians, defendant argues that any objection would have been futile, considering the "wide latitude" the trial court had afforded the prosecution throughout the trial over defendant's objection, for example, by admitting evidence of Mary Ann's suffering and his prior cohabitant abuse of Mary Ann. We disagree. We find nothing in the record that suggests an objection would have been futile.

Defendant argues that objections and/or requests for admonition concerning comments about defense counsel "would have particularly been futile coming from the very attorney whose integrity was being questioned." He further argues that these comments were so pervasive and extended throughout the rebuttal argument that constant objections would have been "counterproductive." "The problem is that defendant made *no objections whatever* to the various instances of asserted misconduct cited above." (*People v. Dennis* (1998) 17 Cal.4th 468, 521 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) A timely objection and admonition by the trial court at the outset might have restrained the prosecutor's aggressiveness *before* it became so pervasive. (See *ibid.*)

We conclude defendant has forfeited any claim of prosecutorial misconduct during closing arguments.[11]

### c. *No misconduct occurred*

In any event, defendant's claim that the cited arguments and comments constituted misconduct lacks merit.

██ A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].) A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Strickland* (1995) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]; accord, *People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

██ When the issue "focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that

---

[11] Defendant claims that defense counsel provided ineffective assistance in violation of the Sixth Amendment to the United States Constitution by failing to object to the asserted misconduct. Ineffective assistance of counsel under the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of a reasonable probability of a more favorable outcome in the absence of the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–696 [80 L.Ed.2d 674, 104 S.Ct. 2052].) Defense counsel was not prejudicially deficient for failing to object to the prosecutor's comments because, as will be discussed, there was no misconduct by the prosecutor.

the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another point in *People v. Hill*, *supra*, 17 Cal.4th 800, 822–823; accord, *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Moreover, prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial," and whether "the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis, supra*, 17 Cal.4th 468, 522.)

We conclude the prosecutor did not overstep the boundary of permissible argument in mentioning the Spanish Inquisition and the persecution of early Christians. With those examples, the prosecutor made the point that fire has historically been used as an instrument of torture and is generally known to cause extreme pain. The point was appropriate in the context of the argument that defendant must have known that using fire to kill Mary Ann was calculated to cause her extreme pain. While the historical events the prosecutor mentioned had religious significance, the prosecutor made no improper appeal to religious authority. (E.g., *People v. Hill, supra*, 17 Cal.4th 800, 836–837 & fn. 6.) Defendant does not contend otherwise. Defendant does argue that references to Mary Ann's suffering were irrelevant and improper, and, thus, that references to historic examples of torture by fire were also improper. We disagree. As discussed above, evidence of Mary Ann's suffering was properly admitted to prove that defendant committed an act calculated to inflict extreme pain. (See *ante*, at p. 1196 et seq.) Accordingly, for the prosecutor to use illustrative analogies to argue the point was not improper.

Neither did the prosecutor commit misconduct in his comments about defense counsel. Although defendant singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole. (See *People v. Dennis, supra*, 17 Cal.4th 468, 522.) Each of the statements about defense counsel was made in the context of rebutting a statement defense counsel had made during his closing argument. For example, the prosecutor's comment that defense counsel was attempting to "deceive" the jury was made in the context of refuting an argument that the word "deliberate" in the deliberate and premeditated murder instruction included considering the consequences of loss of property. The prosecutor also explained to the jury that, contrary to defense counsel's characterization of the definition of "deliberate," the consequences discussed in the murder instruction referred to the consequences of taking a human life. We thus conclude it is not reasonably likely that the jury understood the prosecutor's references to defense counsel as "deceiv[ing]," "unfair," "misleading," or "tricky" to be personal attacks on counsel's integrity. (See, e.g., *People v. Taylor* (2001) 26 Cal.4th 1155, 1167 [113 Cal.Rptr.2d 827, 34 P.3d 937] [referring to defense "tricks" or "moves" did not constitute improper personal attack on defense counsel's integrity]; *People v. Medina, supra*, 11 Cal.4th

694, 759 [commenting that "any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something" did not amount to a personal attack on defense counsel's integrity].)

In summary, the prosecutor's conduct during closing and rebuttal arguments did not infect the trial "with such unfairness as to make the conviction a denial of due process" (*People v. Morales, supra,* 25 Cal.4th 34, 44) or involve "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury" (*People v. Strickland, supra,* 11 Cal.3d 946, 955; accord, *People v. Farnam, supra,* 28 Cal.4th 107, 167). We presume the jurors treated "the prosecutor's comments as words spoken by an advocate in an attempt to persuade" (*People v. Clair, supra,* 2 Cal.4th 629, 663, fn. 8), and we find nothing in the record that would suggest otherwise.[12]

### 3. *Issues Involving First Degree Murder by Lying in Wait*

#### a. *Notice of first degree murder by lying in wait*

Defendant contends the prosecution failed to give adequate notice that it would rely on a theory of murder by lying in wait, in violation of his Sixth and Fourteenth Amendment rights to a fair trial and due process.

Before trial, the prosecution indicated it would proceed on two theories of first degree murder: felony murder based on arson, and premeditated and deliberate murder. During the defense case, however, out of the presence of the jury, the prosecutor stated he "might request an instruction on torture/murder as well as lying in wait." The defense did not object or request a continuance. Later, during a conference on jury instructions, the prosecutor stated he intended to proceed on various theories of murder, including lying in wait, and there was a discussion on the applicability of the lying-in-wait instruction. Over defendant's objection, the court instructed the jury on murder by lying in wait, in accordance with a modified version of CALJIC No. 8.25 (1989 rev.) (5th ed. 1988). As given, the instruction stated: "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise. The lying in wait

---

[12] Defendant also claims that the asserted prosecutorial misconduct calls into question the reliability of his sentence for purposes of the Eighth Amendment to the United States Constitution. The point fails because we have concluded no misconduct occurred. For the same reason, we reject defendant's argument that the trial court had a sua sponte duty under the Fourteenth Amendment's due process clause to prevent such misconduct.

need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

Defendant never objected at trial to any lack of notice that the prosecution would attempt to prove lying in wait. Neither did defendant move for a continuance when the prosecution first indicated it might proceed on that theory, or move to reopen the taking of evidence when the prosecutor asked the court to instruct the jury on that theory. Accordingly, we find that defendant has failed to preserve this issue for review. (*People v. Gurule*, *supra*, 28 Cal.4th 557, 629; *People v. Seaton* (2001) 26 Cal.4th 598, 641 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

Even if the issue were properly before us, we would nevertheless reject the claim on the merits.

 Whether defendant received constitutionally adequate notice that the prosecution was relying on a particular theory of guilt entails a resolution of a mixed question of law and fact that we believe is predominantly legal. As such, we undertake an independent review. (See *People v. Adair* (2003) 29 Cal.4th 895, 906–907 [129 Cal.Rptr.2d 799, 62 P.3d 45].)

 "Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them." (*People v. Seaton*, *supra*, 26 Cal.4th 598, 640.) But "[w]e have long held that under this state's statutory scheme, an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely." (*People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Although there may be some situations in which the United States Constitution may require greater specificity, generally an accused will receive adequate notice of the prosecution's theory of the case from the evidence adduced at the preliminary examination or the indictment proceedings. (*Ibid.*)

 Murder by lying in wait requires (1) a concealment of purpose, (2) a substantial period of watching and waiting for a favorable or opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Gurule*, *supra*, 28 Cal.4th 557, 630; *People v. Hardy* (1992) 2 Cal.4th 86, 163 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

Here, the testimony presented at the preliminary examination put the defense on notice that the prosecution intended to show defendant waited

until Mary Ann was asleep before he poured a flammable liquid on her and ignited it. (See, e.g., *People v. Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr. 200, 749 P.2d 854].) Furthermore, the prosecution at trial presented evidence, through Mary Ann's out-of-court statement to the arson investigator and defendant's statement to police, that Mary Ann was asleep or lying down when defendant poured the flammable liquid on her and ignited it. Finally, the prosecution requested an instruction on the lying-in-wait theory during the jury instruction conference, at which the parties discussed its applicability. This case is therefore unlike *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, in which the prosecution ambushed the defense by submitting an instruction on a felony-murder theory after the jury instruction conference and during closing argument, and in which "the concept of felony-murder [was not] raised, directly or indirectly," at any time "during pretrial proceedings, opening statements, or the taking of testimony . . . ." (*Id.*, at p. 1235; see also *People v. Gallego* (1990) 52 Cal.3d 115, 189 [276 Cal.Rptr. 679, 802 P.2d 169].)

### b. *Insufficient evidence of murder by lying in wait*

In a related argument, defendant claims the trial court erred in instructing the jury on first degree murder by lying in wait because there was insufficient evidence to warrant such an instruction. We reject this argument.

 A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. (See, e.g., *People v. Crew* (2003) 31 Cal.4th 822, 835 [3 Cal.Rptr.3d 733, 74 P.3d 820].) We review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of a lying-in-wait instruction. Stated differently, we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed murder based on a lying-in-wait theory. (E.g., *People v. Ceja* (1993) 4 Cal.4th 1134, 1137, 1142 [17 Cal.Rptr.2d 375, 847 P.2d 55]; *People v. Hardy, supra,* 2 Cal.4th 86, 163–164.)

Mary Ann told the arson investigator that she was asleep when defendant began to pour gasoline on her. Similarly, the arson investigator opined that defendant had poured a flammable liquid on Mary Ann's back as she was sleeping and that the liquid had dripped from her back onto the floor. From such evidence, a reasonable trier of fact could have found beyond a reasonable doubt that defendant had watched and waited until Mary Ann was sleeping and helpless before he poured the flammable liquid on her and ignited it. We therefore conclude that substantial evidence supported the jury instruction on first degree murder by lying in wait.

#### 4. *Issues Involving Murder by Torture*

##### a. *Notice of first degree murder by torture*

Defendant claims the prosecution failed to give adequate notice that it was seeking a first degree murder conviction based on a theory of murder by torture, thus violating his Sixth and Fourteenth Amendment rights to a fair trial and due process. Defendant never objected at trial to a lack of notice and did not move for a continuance. Accordingly, defendant has failed to preserve this issue for review. (*People v. Gurule, supra*, 28 Cal.4th 557, 629; *People v. Seaton, supra*, 26 Cal.4th 598, 641.) In any event, the issue is without merit. The murder charge and the torture-murder special-circumstance allegation plainly gave defendant notice adequate to afford him a meaningful opportunity to defend against the charge of murder by torture.

##### b. *Failure to instruct on the causal relationship between torture and death for murder by torture*

Murder by torture "is 'murder committed with a wil[l]ful, deliberate and premeditated intent to inflict extreme and prolonged pain.' " (*People v. Pensinger, supra*, 52 Cal.3d 1210, 1239, quoting *People v. Steger, supra*, 16 Cal.3d 539, 546.) "The culpable intent is one to cause pain for ' "the purpose of revenge, extortion, persuasion or for any other sadistic purpose." ' " (*People v. Raley, supra*, 2 Cal.4th 870, 888.) There is no requirement that the victim be aware of the pain. (*People v. Pensinger, supra*, at p. 1239.) "However, there must be a causal relationship between the torturous act and death." (*Ibid.*)

At the jury instruction conference, the trial court stated that, with respect to the instruction on murder by torture, it would not instruct the jury that the torturous act must be the proximate cause of death because there was "no issue here . . . whether or not the fire caused the death." Defendant did not object. At trial, the court instructed the jury as follows: "Murder which is perpetrated by torture is murder of the first degree. [¶] The essential elements of murder by torture are: [¶] 1. One person murdered another person, and [¶] 2. The perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. [¶] The crime of murder by torture does not require any proof that the perpetrator intended to kill his victim, or any proof that the victim was aware of pain or suffering. [¶] The word 'willful' as used in this instruction means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word

'premeditated' means considered beforehand." (See also CALJIC No. 8.24 (1989 rev.) (5th ed. 1988).)

Defendant now contends that the trial court erred in failing to instruct on the causal relationship between torture and death, which is an element required to prove murder by torture.

■ The prosecution has the burden of proving beyond a reasonable doubt each element of the charged offense. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260 [48 Cal.Rptr.2d 135, 906 P.2d 1290].) Whether the jury was properly instructed on the elements of the charged offense is a mixed question of law and fact that we believe is predominantly legal. As such, we examine it without deference to the trial court's ruling. An instructional error relieving the prosecution of its burden violates the defendant's rights under both the United States and California Constitutions. (*People v. Flood* (1998) 18 Cal.4th 470, 479–480 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

We find no error. Even though the jury was not expressly instructed on the causal relationship between the torturous act and death, there is no reasonable likelihood that it understood there need be no such causal relationship, given the language of the instruction. Closely following the statutory language, the court instructed the jury that "[m]urder which is perpetrated *by torture* is murder of the first degree." (Italics added; cf. § 189.) The preposition "by," in itself, commonly signifies a causal connection. (See Webster's 3d New Internat. Dict. (2002) p. 307 [defining "by" as "through the means of or instrumentality of," as in "put to death [by] the sword"; definition 4a].)

Even if we did find error, we would have to find that error harmless.

■ Under state law, instructional error that withdraws an element of a crime from the jury's consideration is harmless if there is "no reasonable probability that the outcome of defendant's trial would have been different had the trial court properly instructed the jury." (*People v. Flood, supra,* 18 Cal.4th 470, 490; Cal. Const., art. VI, § 13; *People v. Watson, supra,* 46 Cal.2d 818, 836–837.) Under federal law, the "Fifth Amendment right to due process and Sixth Amendment right to jury trial . . . require the prosecution to prove to a jury beyond a reasonable doubt every element of a crime." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 [109 Cal.Rptr.2d 851, 27 P.3d 739], italics omitted; see *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277–278 [124 L.Ed.2d 182, 113 S.Ct. 2078]; *People v. Flood, supra,* at pp. 479–480, 491.) Accordingly, a trial court's failure to instruct on an element of a crime is federal constitutional error that requires reversal of the conviction unless it can be shown beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*Neder v. United States*

(1999) 527 U.S. 1, 8–16 [144 L.Ed.2d 35, 119 S.Ct. 1827] *Chapman v. California, supra*, 386 U.S. 18, 24; *People v. Sengpadychith, supra*, at p. 324; *People v. Flood, supra*, at pp. 502–504.)

Evidence at trial was uncontested that defendant's actions caused Mary Ann's death. Indeed, defendant's closing argument was not that he did not kill Mary Ann but that he did not kill her with premeditation and deliberation, did not kill her by lying in wait, did not intend to torture her, and did not kill her in the commission of arson. Accordingly we find that even if the trial court's failure to instruct expressly on the causal relationship had been erroneous, it would have been harmless under any standard.

c. *Failure to instruct on intoxication and mental disease relating to intent to torture for murder by torture*

The trial court instructed the jury: "In each of the crimes and allegations charged in the information, there must exist a certain mental state in the mind of the perpetrator. . . . [¶] The mental states required are included in the definitions of the crimes or allegations charged." (CALJIC No. 3.31.5 (1989 rev.) (5th ed. 1988).) The court defined intoxication as voluntary "if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he or she willingly assumes the risk of that effect." (See CALJIC No. 4.22 (5th ed. 1988).) The court also instructed on the relevance of voluntary intoxication to specific intent, as follows: "In the crime and special circumstances of which the defendant is accused in Count I [i.e., murder, arson-murder special circumstance, and torture-murder special circumstance] and the crime of which the defendant is accused in Count II [i.e., arson] of the Information, a necessary element is the existence in the mind of the defendant of certain specific intents and/or mental states. The specific intent and/or mental state required is included in the definitions of the crimes or allegations charged. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crimes, you should consider that fact in determining whether defendant had such specific intent and/or mental state. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent and/or mental state, you must find that he did not have such specific intent and/or mental state." (See CALJIC No. 4.21 (5th ed. 1988).) As for evidence of mental disease, the court instructed the jury as follows: "Evidence has been received regarding a mental disease, mental defect or mental disorder of the defendant at the time of the crime charged in Counts I and II. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in Counts I and II and any special allegations charged." (See CALJIC No. 3.32 (5th ed. 1988).)

Defendant contends that the trial court erred in failing to instruct on the causal relationship of intoxication and mental disease to the mental state necessary for murder by torture, that is, the intent to inflict extreme pain. We disagree.

The legal adequacy of an instruction is reviewed independently. (See *People v. Alvarez, supra,* 14 Cal.4th 155, 217–218.)

As stated, the trial court instructed the jury that murder required a certain mental state that was included in its definition. The jury was advised that it could consider evidence of voluntary intoxication in determining whether defendant had such mental state and could also consider evidence of mental disease, defect, or disorder in determining whether or not the defendant actually formed that mental state. The court instructed the jury that an element of murder by torture was "willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." Viewing the instructions as a whole, we conclude the jury was adequately instructed that intoxication and mental disease were relevant to the requisite mental state for murder by torture, that is, the intent to inflict extreme pain. (See, e.g., *People v. Clark* (1993) 5 Cal.4th 950, 1021 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

This case is distinguishable from *People v. Pensinger, supra,* 52 Cal.3d 1210. There, we stated that because murder by torture "involves a unique specific intent which the standard instructions on murder do not cover, . . . when intoxication is relevant to the formation of specific intent, the instruction on intoxication should be related to the specific intent involved in torture." (*Id.,* at p. 1243.) Although the trial court there had instructed, inter alia, that intoxication could be relevant to the intent to kill necessary to establish murder or manslaughter, it did not specify that intoxication could also be relevant to the intent necessary to prove a murder by torture, that is, the intent to inflict extreme pain. (*Id.,* at p. 1242.) We nevertheless concluded that the evidence of intoxication was insufficient to require the court to give such an instruction in that case. (*Id.,* at p. 1243.) In contrast, the trial court here instructed that evidence of intoxication or mental disease could be relevant to the requisite mental state for murder by torture.[13]

---

[13] Because we conclude the trial court did not err, we reject defendant's claim that the asserted error violated article I, section 15 of the California Constitution, the right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and the right to a reliable sentencing procedure under the Eighth Amendment to the United States Constitution.

### d. *Failure to instruct on provocation relating to intent to torture for murder by torture*

Defendant similarly contends that the trial court erred in failing to instruct on the relationship of provocation to the mental state necessary for murder by torture, that is, the intent to inflict extreme pain. He claims that instructing the jury according to CALJIC No. 8.73 that it could consider "evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree" was insufficient.

Defendant did not ask the trial court to clarify or amplify the instruction. Thus, he may not complain on appeal that the instruction was incomplete. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778–779 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

In any event, the argument is without merit.

As stated, we review independently the legal adequacy of a jury instruction.

Defendant argues the trial court should have instructed on provocation *for purposes of voluntary manslaughter*. But provocation for such purposes has nothing to do with intent and everything to do with circumstances, specifically, whether the circumstances would have caused a reasonable person to act as defendant did. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Thus, to instruct on provocation for purposes of voluntary manslaughter would have not assisted the jury in determining whether provocation prevented defendant from forming the intent necessary to commit murder by torture. The two concepts are distinct.

The court did instruct the jury on provocation as relevant to this case. Specifically, the court instructed that, if "the killing was preceded and accompanied by a clear, deliberate intent . . . , which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation,*" it was first degree murder. (Italics added; see CALJIC No. 8.20 (5th ed. 1988) [deliberate and premeditated murder].) As stated, the court also instructed that, if "the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, . . . and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree." (See CALJIC No. 8.73 (5th ed. 1988) [evidence of provocation may be considered in determining degree of murder].) Finally, the court instructed

that, if the jury had a reasonable doubt as to whether the murder was of the first or second degree, the jury had to give the defendant the benefit of the doubt and return a verdict of second degree murder. (See CALJIC No. 8.71 (5th ed. 1988) [doubt whether first or second degree murder].) There is no reasonable likelihood that the jury would have understood these instructions to foreclose them from considering evidence of provocation, if any, in connection with murder by torture. (*People v. Hughes* (2002) 27 Cal.4th 287, 343 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Clark, supra,* 5 Cal.4th 950, 1021.)[14]

### e. *Insufficient evidence of murder by torture*

Defendant contends the evidence at the close of the People's case-in-chief was in sufficient under section 1118.1,[15] and the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution, to support a first degree murder conviction on a theory of murder by torture. He also contends the evidence was insufficient under the due process clauses of the Fourteenth Amendment and article I, section 15 to support such a conviction at the close of all the evidence. The focus of defendant's claim is that the evidence was insufficient on the element of intent to inflict extreme pain.

In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence— that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *People v. Berryman, supra,* 6 Cal.4th 1048, 1083; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in

---

[14] Because we conclude the trial court adequately instructed on the relevance of provocation, we reject defendant's claim that the asserted error violated article I, section 15 of the California Constitution, the right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and the right to a reliable sentencing procedure under the Eighth Amendment to the United States Constitution.

[15] Section 1118.1 provides in pertinent part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

reviewing the sufficiency of the evidence to support a conviction, that is, " 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017]; see *People* v. *Mincey, supra,* 2 Cal.4th 408, 432, fn. 2.)" (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 139, fn. 13.) "Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point." (*People* v. *Trevino* (1985) 39 Cal.3d 667, 695 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on another point in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1219–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].)

A defendant need not articulate the grounds for his motion for acquittal, and there is no requirement that the motion be made in a particular form. (*People* v. *Belton* (1979) 23 Cal.3d 516, 521 [153 Cal.Rptr. 195, 591 P.2d 485].) Thus, in *Belton,* we held that the defendant's motion for an acquittal was made in proper form where defense counsel merely stated he did not think there was sufficient evidence to convict the defendant of any crime. (*Id.,* at pp. 521 & fn. 6, 522–523.)

At the close of the People's case-in-chief, defendant moved for a judgment of acquittal as to the special circumstance allegations based on torture murder and felony murder (arson) only. Citing *People* v. *Belton, supra,* 23 Cal.3d 516, defendant argues that his motion encompassed the first degree murder charge on the theory of murder by torture. Respondent, in turn citing a Court of Appeal case declining to extend *Belton* to a situation where a motion for acquittal in a court trial directed to specific counts also encompasses undesignated counts or special circumstance allegations (*People* v. *Ceja* (1988) 205 Cal.App.3d 1296, 1301–1304 [253 Cal.Rptr. 132]), contends that defendant's failure to include the first degree murder charge within the scope of his motion forfeited this issue for appeal. We need not resolve this issue, for even assuming the first degree murder charge was included in defendant's motion for acquittal, we conclude there was sufficient evidence of murder by torture, both at the close of the prosecution's case-in-chief and at the close of the entire case.

We review independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction. (See *People* v. *Trevino, supra,* 39 Cal.3d 667, 695; see also, e.g., *People* v. *Hatch* (2000) 22 Cal.4th 260, 275 [92 Cal.Rptr.2d 80, 991 P.2d 165].) We also determine independently whether the evidence is sufficient under the federal and state constitutional due process clauses.

As noted above, for purposes of proving murder by torture, the intent to inflict extreme pain "may be inferred from the circumstances of the crime, the

nature of the killing, and the condition of the victim's body." (*People v. Morales, supra*, 48 Cal.3d 527, 559.) But we also have "cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an 'explosion of violence,' as with the intent to inflict cruel suffering." (*People v. Pensinger, supra*, 52 Cal.3d 1210, 1239.)

We reject defendant's claim under the federal and state constitutional due process clauses and, as a result, reject his claim under section 1118.1 as well (see *People v. Hillhouse* (2002) 27 Cal.4th 469, 496, fn. 2 [117 Cal.Rptr.2d 45, 40 P.3d 754]). Defendant maintains that this case falls into the "explosion of violence" category. But there was substantial evidence from which a rational jury could have found beyond a reasonable doubt that defendant had the requisite intent to inflict extreme pain. Verbal abuse and excessive drinking characterized defendant and Mary Ann's five-year relationship, and all accounts indicated that they were functional alcoholics. Placed against this background, the prosecution also presented evidence that defendant was jealous and possessive of Mary Ann, that she planned to move out of their residence without him, that she discussed battered women's shelters with Jacquelyn Blakely, and that defendant believed Mary Ann was cheating on him. Such evidence, when considered with evidence of the manner in which defendant had poured a flammable liquid on two distinct places—on Mary Ann and on the floor near the bedroom door—the resulting condition of Mary Ann's body, defendant's statement to Mary Ann when he ignited the fire that he hoped she burned in hell, and his statements thereafter that he was angry at her and wanted to kill her, permit an inference that defendant's purpose in setting Mary Ann on fire was to inflict extreme pain. Moreover, the prosecution proved in rebuttal that, a week before the fire, defendant said he would burn the house down if Mary Ann tried to leave him and that he telephoned Mary Ann's mother numerous times—each time more agitated than the last—and at one point mentioned that he thought Mary Ann was seeing someone else. This evidence further supported the inference that defendant intended to inflict extreme pain.

### 5. *Failure to Instruct on Voluntary Manslaughter*

The trial court instructed the jury on first degree murder on theories of willful, premeditated, and deliberate murder, murder by lying in wait, murder by torture, and felony murder (arson), and also on second degree murder. During a conference on jury instructions, the court said it would not instruct on homicide, which includes both murder and manslaughter, because manslaughter, whether voluntary or involuntary, did not "have anything to do with this case." The court asked defense counsel if he agreed, and defense counsel asked in return, "[W]ould you give me a manslaughter instruction if I

asked?" The court replied, "The evidence does not support it whatsoever," and defense counsel explained, "That's why I didn't ask for it. I didn't want to be embarrassed."

Defendant argues that the trial court erred in failing to instruct sua sponte on voluntary manslaughter, a lesser included offense of murder, because there was substantial evidence warranting the instruction based on the theory of heat of passion.

■■■■ "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . ." (*People v. Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other points in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1], and in *People v. Breverman* (1998) 19 Cal.4th 142, 176 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) " 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *People v. Lewis, supra,* 25 Cal.4th 610, 645.) Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction." (*People v. Cunningham, supra,* at p. 1008, italics omitted.) " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Lewis, supra,* at p. 645, quoting *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense. (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 739 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

■■■■ Voluntary manslaughter is a lesser included offense of murder. (*People v. Lewis, supra,* 25 Cal.4th 610, 645.) One form of the offense is defined as the unlawful killing of a human being without malice aforethought "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may

set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele, supra*, 27 Cal.4th 1230, 1252–1253.)

 The record does not contain substantial evidence to support a voluntary manslaughter instruction on the theory that defendant acted in the heat of passion after an argument with Mary Ann. Evidence that defendant was intoxicated and jealous, and his taped statement to the police that he went "berserk" after Mary Ann said she would put a "butcher knife in your ass," may have satisfied the *subjective* element of heat of passion. (See, e.g., *People v. Steele, supra*, 27 Cal.4th 1230, 1253.) "But it does not satisfy the *objective*, reasonable person requirement, which requires provocation by the victim." (*Ibid.*, italics added; cf. *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [124 Cal.Rptr.2d 373, 52 P.3d 572] [passion for revenge will not reduce murder to manslaughter].) " 'To satisfy the objective or "reasonable person" element . . . of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' " (*People v. Steele, supra*, at p. 1253, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311]; see also *People v. Waidla, supra*, 22 Cal.4th 690, 740, fn. 17.) Such evidence was lacking. While defendant and Mary Ann had argued, Mary Ann was in bed when defendant began his physical assault by pouring gasoline on her. Furthermore, between defendant and Mary Ann, bickering, yelling, and cursing were the norm. Their conduct that evening apparently was no different than on the many other occasions on which they had argued in their five-year relationship. Neither was defendant's drinking on the day of the fire different than on any other day. Accordingly, the trial court did not err in failing to instruct on voluntary manslaughter based on heat of passion.

Defendant's reliance on *People v. Berry* (1976) 18 Cal.3d 509 [134 Cal.Rptr. 415, 556 P.2d 777] is misplaced. In *Berry*, the defendant, who was 46 years old at the time of the crime, was convicted, among other things, of the first degree murder of his 20-year-old wife. We reversed the murder conviction, holding that the trial court had prejudicially erred in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion. (*Id.*, at pp. 512, 514–515.) In so holding, we found that the defendant's testimony at trial, as well as the testimony of a psychiatrist, chronicled a "two-week period of provocatory conduct" by the victim— which alternated between verbally taunting the defendant with her involvement with another man, three days after her marriage to the defendant, and sexually exciting the defendant, indicating her desire to remain with him— that "could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Id.*, at pp. 513–515.) In contrast to the facts of *Berry*, defendant

and Mary Ann's five-year relationship was filled with excessive drinking and fighting, sometimes violently, and their argument on the night of the fire was nothing out of the ordinary.[16]

### 6. *Failure to Define Provocation and Heat of Passion*

The court's standard instructions to the jury on premeditated and deliberate murder, and on determining the degree of murder, used the terms "heat of passion" and "provocation." Specifically, the court instructed that if "the killing was preceded and accompanied by a clear, deliberate intent . . . , which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation*," it was first degree murder. (Italics added; see CALJIC No. 8.20 (5th ed. 1988) [premeditated and deliberate murder].) The jury was also instructed that if "the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, . . . and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree." (See CALJIC No. 8.73 (5th ed. 1988) [evidence of provocation may be considered in determining degree of murder].)

Defendant argues that, because the instructions quoted above referred to heat of passion and provocation for purposes of defining first and second degree murder, the court had a sua sponte duty to define those terms *as they related to the crime of voluntary manslaughter*. In other words, defendant argues on this additional basis that the trial court had a duty to instruct on voluntary manslaughter. We reject the contention.

We apply an independent or de novo standard of review to the failure by a trial court to instruct on the meaning of provocation and heat of passion. "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that, we believe, is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla, supra,* 22 Cal.4th 690, 733.)

Provocation and heat of passion as material to voluntary manslaughter were simply immaterial to this case because, as previously discussed, the evidence did not support instructions on voluntary manslaughter. Provocation and heat of passion as used in the instructions here bore their common

---

[16] Defendant claims that the trial court's assertedly erroneous failure to instruct on voluntary manslaughter requires reversal under the United States and California Constitutions. The point fails because, as we have concluded, the court's failure to instruct was not erroneous.

meaning, which required no further explanation in the absence of a specific request. (See *People v. Cox* (2003) 30 Cal.4th 916, 967 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

### 7. Failure to Instruct on Second Degree Felony Murder Based on Unlawfully Causing a Fire

As stated, the jury was instructed on several theories of first degree murder, including felony murder based on arson. Defendant now contends the trial court erred in failing to instruct on second degree felony murder—a lesser included offense of first degree felony murder—based on the crime of unlawfully causing a fire (§ 452)—a lesser included offense of arson. He argues the evidence supports a conclusion that the house burned not as a result of an intentional burning of the house itself but as a result of reckless conduct in setting fire to Mary Ann. Defendant relies on his trial testimony that he threw the gasoline toward Mary Ann, intending to burn her only.

We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. (See *People v. Waidla, supra,* 22 Cal.4th 690, 733.) A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, " 'that is, evidence that a reasonable jury could find persuasive' " (*People v. Lewis, supra,* 25 Cal.4th 610, 645), which, if accepted, " 'would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser"* (*People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305]). (Accord, *People v. Heard, supra,* 31 Cal.4th 946, 980–981; *People v. Waidla, supra,* at p. 733.) A person is guilty of arson when he "willfully and maliciously sets fire to or burns . . . any structure . . . or property" (§ 451), whereas a person is guilty of unlawfully causing a fire when he "recklessly" sets fire to such a structure or piece of property (§ 452).

On our independent review, assuming for the sake of argument that unlawfully setting fire to an inhabited structure is a lesser included offense of arson (see *People v. Mendoza* (2000) 24 Cal.4th 130, 175 [99 Cal.Rptr.2d 485, 6 P.3d 150]), and further assuming that unlawfully setting a fire is an inherently dangerous felony subject to the second degree felony-murder rule (see *People v. Cunningham, supra,* 25 Cal.4th 926, 1008–1009), the evidence was insufficient to require the trial court to instruct on such an offense. The evidence of the cause and nature of the fire, as presented by the arson investigator, established that the flammable liquid used to start the fire was poured in two distinct areas—near the bedroom door and near the foot of the bed—and ignited separately. On the night of the fire, defendant himself admitted he poured gasoline on the bedroom floor and that he wanted to burn the house, as well as Mary Ann. The evidence here was not substantial

enough to merit consideration by the jury of the possibility that defendant had recklessly set fire to Mary Ann, who was on the bed, without intending also to burn the house. (See, e.g., *People v. Mendoza, supra*, at pp. 174–175.) Accordingly, the evidence here was not substantial enough to merit consideration by the jury of the possibility that the murder occurred during the commission of unlawfully causing a fire.[17]

### 8. *Failure to Instruct on Second Degree Felony Murder Based on Torture*

As stated, the jury was instructed that murder by torture was murder of the first degree (§ 189). The jury found defendant guilty of first degree murder and further found that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).) Defendant now contends the trial court erred in failing to instruct on second degree felony murder based on the predicate felony of torture (§ 206), an assertedly lesser included offense of murder by torture. We reject the contention.

As stated, we apply the independent or de novo standard of review to the failure by the trial court to instruct on an uncharged offense that was assertedly lesser than, and included in, a charged offense.

In 1988, when defendant killed Mary Ann, section 189 provided, inter alia, that "All murder which is perpetrated by means of . . . torture, or by any other kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree." A separate crime of torture did not exist until June 5, 1990, when section 206 was added by Proposition 115 and approved by the voters. Section 206 defines torture (the infliction of great bodily injury with "the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose") in essentially the same way we have defined torture as used in section 189, which declares that murder by torture is murder in the first degree. (See, e.g., *People v. Raley, supra*, 2 Cal.4th 870, 888; *People v. Pensinger, supra*, 52 Cal.3d 1210, 1239; *People v. Bittaker, supra*, 48 Cal.3d 1046, 1101; *People v. Davenport, supra*, 41 Cal.3d 247, 267; *People v. Wiley, supra*, 18 Cal.3d 162, 168.) In 1999, section 189 was amended to add section 206 to the enumerated felonies defining first degree felony murder. (Stats. 1999, ch. 694, § 1.)

Defendant argues that between 1990, when section 206 was added to the Penal Code, and 1999, when section 206 was added to section 189 as an

---

[17] Defendant claims that the trial court's assertedly erroneous failure to instruct on second degree felony murder based on unlawfully causing a fire deprived him of his rights to due process and trial by jury under article I, section 15 of the California Constitution, and his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. The point fails because, as we have concluded, the court did not err in failing to so instruct.

enumerated felony defining first degree felony murder, section 206 could have been a predicate felony supporting nonstatutory second degree felony murder. Defendant acknowledges that section 206 did not exist at the time of his crimes against Mary Ann, but nevertheless argues the trial court should have instructed the jury on second degree felony murder, predicated on section 206, as a necessarily included offense of murder perpetrated by torture. In short, defendant claims that the court had a sua sponte duty to instruct on the lesser included offense of second degree felony murder predicated on a felony that did not exist at the time he committed his crimes. No California court has recognized such a duty, and we decline to do so here.

In support of his claim, defendant argues that he could have waived any objection to being charged with an as-yet-unenacted offense "in order to give the jury the option of [considering] a lesser included offense of felony second-degree murder." *Spaziano v. Florida* (1984) 468 U.S. 447 [82 L.Ed.2d 340, 104 S.Ct. 3154] (*Spaziano*), on which defendant relies, is distinguishable. In *Spaziano*, a capital case, the statute of limitations for the defendant's noncapital offenses had expired. At the close of evidence, the trial court informed the defendant that it would instruct on four lesser-included noncapital offenses if he would waive the statute of limitations as to those offenses. The defendant refused to do so, the court did not instruct on lesser included offenses, and the jury convicted the defendant of capital murder. (*Id.*, at pp. 449–451.) The United States Supreme Court, mindful of its holding in *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382] (*Beck*), that a sentence of death cannot be constitutionally imposed where the jury was not given the option of convicting on an existing lesser-included noncapital offense supported by the evidence, held that the defendant should have been permitted to choose between having the benefit of an instruction on the time-barred lesser included offenses or of asserting the statute of limitations on those offenses. The high court also held, however, that the trial court in *Spaziano* did not err in refusing to instruct on the lesser included offenses because the defendant had knowingly refused to waive the statute of limitations as to those offenses. (*Spaziano, supra*, at pp. 456–457; cf. *United States v. DeTar* (9th Cir. 1987) 832 F.2d 1110, 1112–1115 [trial court in a noncapital case committed reversible error by failing to instruct the jury on a time-barred lesser included offense because the defendant had waived the statute of limitations by requesting an instruction on the lesser included offense].)

In contrast to *Spaziano, supra*, 468 U.S. 447, and *Beck, supra*, 447 U.S. 625, the jury in defendant's case was not given an all-or-nothing choice between capital murder or innocence. The jury was instructed on a lesser included offense of second degree murder, "and that is adequate to indicate that the verdict of capital murder represented no impermissible choice." (*Schad v. Arizona* (1991) 501 U.S. 624, 648 [115 L.Ed.2d 555, 111 S.Ct.

2491].) Moreover, *Spaziano* addressed properly chargeable lesser included offenses barred only by a defense, the statute of limitations, that the defendant was entitled to waive. Here, in contrast, defendant suggests the court had a sua sponte duty to instruct the jury on an offense he could not possibly have committed and of which any conviction would necessarily be void as ex post facto. In short, the authorities on which defendant relies do not support his claim.[18]

### 9. *Failure to Require Unanimous Agreement on the Theory of Guilt*

Defendant contends the trial court erred by failing to require unanimous agreement as to which theory of guilt the jury accepted to support a first degree murder verdict, i.e., premeditated and deliberate murder, murder by torture, murder by lying in wait, or felony murder (arson). We reject the contention, as we have rejected similar ones. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1131 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395 [63 Cal.Rptr.2d 1, 935 P.2d 708].) *Schad v. Arizona, supra,* 501 U.S. 624, 632–636, on which defendant relies, does not hold otherwise. (*People v. Box, supra,* at p. 1212.)[19]

### 10. *Failure to Instruct on Sufficiency of Circumstantial Evidence to Prove Mental State*

Over the People's objection and on defendant's request, the trial court instructed the jury on sufficiency of circumstantial evidence generally (see CALJIC No. 2.01 (5th ed. 1988)), to the effect that a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only consistent with the theory of defendant's guilt but cannot be reconciled with any other rational conclusion, and that if circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to

---

[18] Defendant claims that the trial court's assertedly erroneous failure to instruct on second degree felony murder based on torture deprived him of his right to due process and trial by jury under article I, section 15 of the California Constitution, his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and his right to a reliable sentence under the Eighth Amendment to the United States Constitution. The point is without merit because, as we have concluded, the court did not err in failing to so instruct.

[19] Because we find the trial court did not err, we reject defendant's contention that the asserted error deprived him of "his right to have the prosecution establish proof of the crimes charged beyond a reasonable doubt, to due process, and to a reliable determination of allegations that he committed a capital offense under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, section 15 of the California Constitution."

his innocence, it must adopt the interpretation that points to the defendant's innocence and reject the interpretation that points to his guilt.

Defendant now contends the trial court erred in failing to instruct sua sponte on the sufficiency of circumstantial evidence to prove specific intent or mental state particularly. (See CALJIC No. 2.02 (5th ed. 1988).) Such an instruction would have informed the jury that a finding of guilt as to a charged offense may not be based on circumstances surrounding the commission of the act unless the proved circumstances are not only consistent with the theory that the defendant had the required specific intent or mental state but cannot be reconciled with any other rational conclusion, and that if evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence thereof, the jury must adopt the interpretation that points to the absence of the specific intent or mental state. (CALJIC No. 2.02.)

 The general instruction on sufficiency of circumstantial evidence is a more inclusive instruction on sufficiency of circumstantial evidence than the instruction on sufficiency of circumstantial evidence to prove specific intent or mental state, and the former is the proper instruction to give unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state. (*People v. Hughes*, *supra*, 27 Cal.4th 287, 347; *People v. Marshall* (1996) 13 Cal.4th 799, 849 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Rodrigues*, *supra*, 8 Cal.4th 1060, 1142.) Contrary to defendant's argument, specific intent or mental state was not the only element of the case that rested substantially or entirely on circumstantial evidence. One of the elements of murder by lying in wait is waiting and watching for an opportune time to act, and proof of it rested on circumstantial evidence. (Cf. *People v. Mitchell* (1994) 30 Cal.App.4th 783, 810–811 [36 Cal.Rptr.2d 150] [no error in instructing on sufficiency of circumstantial evidence generally rather than sufficiency to prove specific intent where more than one element of the charged crime of conspiracy could be proved by circumstantial evidence].) Because the more general instruction logically includes the more specific, and because more than one element here rested on circumstantial evidence, the trial court did not commit error by providing only the more inclusive instruction.[20]

---

[20] Defendant claims that the trial court's assertedly erroneous failure to instruct the jury on circumstantial evidence to prove specific intent or mental state violated his right to due process under the Fourteenth Amendment to the United States Constitution and his right to a reliable sentence under the Eighth Amendment to that Constitution. The point fails because, as we have concluded, the court did not err in failing to so instruct.

### 11. *Erroneous Instruction on Efforts by Defendant to Fabricate Evidence*

Over defendant's objection, the trial court instructed the jury that it was permitted to infer "consciousness of guilt" from any attempt by defendant to "persuade a witness to testify falsely or . . . fabricate evidence to be produced at the trial." (See CALJIC No. 2.04 (5th ed. 1988).)

Defendant contends here, as he did below, that there was insufficient evidence to warrant an inference that he had attempted to persuade a witness to "testify falsely" or "fabricate evidence" to be produced at trial. Defendant acknowledges on appeal that his former neighbors Steve Hoeck and David Carpenter testified he had given them gifts of tobacco when they were in jail with him after the preliminary examination in this case. Defendant argues, however, that such evidence was insufficient to warrant the inference that his gifts were intended to persuade the recipients to testify falsely at his trial. Defendant contends that their trial testimony regarding his propensity for drunkenness did not differ substantively from their preliminary examination testimony.

There was no error. The jury could reasonably have found that defendant attempted to persuade Hoeck or Carpenter, or both, to testify falsely, even if the attempt was unsuccessful. Under these circumstances, the jurors were properly instructed that the "weight and significance, if any," to be accorded such evidence was for their determination.

Even if the evidence had been insufficient to give an instruction on efforts by defendant to fabricate evidence, any error would be harmless. " '[A]t worst, there was no evidence to support the instruction and . . . it was superfluous. [E]vidence of defendant's guilt was strong. Under the circumstances, reversal on such a minor, tangential point is not warranted.' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1225 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Accordingly, contrary to his claim, defendant was not denied his rights to due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution or the California Constitution.

### 12. *Insufficient Evidence of Premeditated and Deliberate First Degree Murder*

Defendant contends that there was insufficient evidence, under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution, to support a conviction of first degree murder by premeditation and deliberation. He also

contends the trial court erred in denying his motion under section 1118.1 to dismiss the first degree murder charge based on a theory of premeditation and deliberation.[21]

As stated, in reviewing a challenge to the sufficiency of the evidence, we review the entire record in a light most favorable to the judgment to determine whether it discloses substantial evidence. (*People v. Johnson, supra,* 26 Cal.3d 557, 578; see also *Jackson v. Virginia, supra,* 443 U.S. 307, 317–320.)

Moreover, in ruling upon a motion for judgment of acquittal under section 1118.1, a trial court applies the same standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. (*People v. Crittenden, supra,* 9 Cal.4th 83, 139, fn. 13.)

Murder that is perpetrated by "willful, deliberate, and premeditated killing" is murder in the first degree. (§ 189.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. . . . 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. (*People v. Raley, supra,* 2 Cal.4th 870, 887; *People v. Pensinger, supra,* 52 Cal.3d 1210, 1237.) When evidence of all three categories is not present, "we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." (*People v. Pensinger, supra,* at p. 1237.) But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], "are descriptive, not normative." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) They are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Ibid.*)

---

[21] As we noted with respect to a similar argument on the theory of murder by torture, we need not resolve the question whether defendant's motion for aquittal adequately encompassed the first degree murder charge so as to preserve it for appeal. For even assuming the murder charge was included in defendant's motion, we conclude there was sufficient evidence of premeditated and deliberate first degree murder.

Our review of the record as of the close of the prosecution's case-in-chief discloses, at the least, evidence of motive in conjunction with a deliberate manner of killing. With respect to motive, Mary Ann told the arson investigator that defendant had been following her around all day, that he was extremely jealous of her, and that he thought she was cheating on him. Richard Mahoney, Mary Ann's brother, similarly testified that defendant was very possessive of Mary Ann and that he was jealous of the people who were with her in his absence. Further, the day before the fire, Mary Ann told Jacquelyn Blakely that she planned to give notice to her landlord within three days that she alone would be moving out, and Blakely, in turn, talked to Mary Ann about shelters for battered women.

There was also evidence of a deliberate manner of killing. There was considerable evidence that defendant poured a flammable liquid directly on Mary Ann while she was asleep or half asleep and ignited it after she awoke. As he did so, he told Mary Ann, "[I] hope you fuckin' burn to death." "We recognize that a cold and calculating decision to kill can be arrived at very quickly; we do not measure the necessary reflection solely by its duration." (*People v. Pensinger, supra,* 52 Cal.3d 1210, 1238.)

A review of the entire record shows additional evidence from which a rational jury could find beyond a reasonable doubt that defendant committed a premeditated and deliberate murder. Bartender Charlene Garcia testified that a week before the fire, defendant came into the Red Rooster and told her that he was upset because Mary Ann was planning to move out. He told Garcia that he believed Mary Ann was cheating on him and further said that if Mary Ann tried to leave him he would "burn the fucking house down." On the day of the fire, defendant telephoned Mary Ann's mother Gertrude over a dozen times and, during one telephone call, told her he believed Mary Ann was seeing someone else. Although defendant himself denied that he thought Mary Ann was cheating on him, denied that Mary Ann was intending to move out, and denied telling the bartender he would burn down the house if Mary Ann tried to leave him, there was indeed substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that defendant committed a premeditated and deliberate murder.[22]

---

[22] Defendant claims that insufficiency of the evidence to support a conviction for premeditated and deliberate murder violated his right to a reliable sentence under the Eighth Amendment to the United States Constitution. The point is without merit because, as we have concluded, there was substantial evidence to support such a conviction.

### 13. *Issues Involving the Torture-murder Special Circumstance*

#### a. *Erroneous instruction on the torture-murder special circumstance*

As mentioned, the trial court gave the standard instruction on premeditated and deliberate murder (CALJIC No. 8.20) and also gave a modified instruction on murder by torture (CALJIC No. 8.24).

Concerning the torture-murder special circumstance, the jury was instructed as follows: "To find that the special circumstance referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. The defendant intended to kill or intended to aid in the killing of a human being; [¶] 2. The defendant intended to inflict extreme, cruel, physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose; and [¶] 3. The defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." (See CALJIC No. 8.81.18 (5th ed. 1988).)

Defendant contends the trial court failed to instruct the jury that, for the torture-murder special circumstance, the intent to torture, that is, the intent to inflict extreme pain, must be (1) premeditated and deliberate and (2) in addition to the intent to cause pain necessary for death. He also contends that the court confused the jury by instructing that he must have, in fact, inflicted such pain while also instructing that awareness of pain was not required.

We independently review the question of whether the jury was correctly instructed on all elements of a special circumstance allegation.

At the time defendant committed his crimes against Mary Ann, the torture-murder special circumstance required that the murder be "intentional" and "involve[] the infliction of torture." (§ 190.2, subd. (a)(18).) In other words, there had to be intent to kill, intent to torture, and commission of an act calculated to cause extreme pain. (See *People v. Proctor* (1992) 4 Cal.4th 499, 534–535 [15 Cal.Rptr.2d 340, 842 P.2d 110]; *People v. Davenport,* *supra,* 41 Cal.3d 247, 271.) "The special circumstance is distinguished from murder by torture . . . because . . . the defendant must have acted with the intent to kill." (*People v. Davenport, supra,* at p. 271.)

Contrary to defendant's argument, *premeditated and deliberate* intent to torture is not an element of the torture-murder special circumstance. Defendant's rationale for the argument that the intent to torture required for the

torture-murder special circumstance must be premeditated and deliberate is as follows: (1) the language of the torture-murder special circumstance "must be understood in light of the established meaning of torture" (*People v. Davenport, supra,* 41 Cal.3d 247, 271); (2) the established meaning of murder by torture is " 'murder committed with a wil[l]ful, *deliberate and premeditated intent to inflict extreme and prolonged pain*' " (*People v. Raley, supra,* 2 Cal.4th 870, 899, italics added); and (3) the intent-to-torture element in murder by torture is the same for the torture-murder special circumstance.

We reject defendant's argument. "The history of section 189 and our construction of its language establish that [murder by torture] was categorized as first degree murder because the Legislature intended that the *means* by which the killing was accomplished be equated to the premeditation and deliberation which render other murders sufficiently reprehensible to constitute first degree murder. A murder by torture was and is considered among the most reprehensible types of murder because of the calculated nature of the acts causing death, not simply because greater culpability could be attached to murder in which great pain and suffering are caused to the victim." (*People v. Wiley, supra,* 18 Cal.3d 162, 168–169.) Accordingly, we have stated that "the words 'wil[l]ful, deliberate, and premeditated intent to inflict extreme and prolonged pain[]' refer[] only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wil[l]ful, deliberate, premeditated intent to kill that renders other murders sufficiently culpable to be classified as first degree murder, it is unnecessary in torture-murder to also find that the killing itself was 'wil[l]ful, deliberate, and premeditated.' " (*Id.,* at p. 173, fn. 4; see also *People v. Steger, supra,* 16 Cal.3d 539, 546.) Because the intent to inflict extreme pain essentially equates to the premeditation and deliberation aspect that renders other murders sufficiently reprehensible to constitute first degree murder, it was unnecessary to expressly instruct the jury that the requisite intent must be premeditated and deliberate.

Defendant next contends that the trial court failed to instruct the jury that the intent to torture in the torture-murder special circumstance must be the intent to inflict pain that is in addition to the pain of death. He argues that the instruction given on this point—that the intent must be to "inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose"—was insufficient. He suggests that the jury should have been instructed, as they were on murder by torture, that the pain must also be "prolonged."

We disagree. We have held that by enacting the torture-murder special circumstance statute (§ 190.2, subd. (a)(18)), the electorate "meant to foreclose any requirement that the defendant be proved to have intended to inflict *prolonged* pain." (*People v. Davenport, supra,* 41 Cal.3d 247, 269, italics added.) We have also "consistently approved the language of [instructions like those] given in this case as a correct statement of the law of California." (*People v. Raley, supra,* 2 Cal.4th 870, 899.)

Defendant also contends that the trial court confused the jury by inconsistently instructing that infliction of extreme pain was an element of the torture-murder special circumstance but that awareness of pain by the deceased was not. He claims that awareness of pain by the deceased is an element of the torture-murder special circumstance because one cannot inflict pain upon a victim without the victim being aware of it.

We rejected such an argument in *People v. Davenport, supra,* 41 Cal.3d 247, holding, in effect, that the elements of the torture-murder special circumstance included that "the perpetrator intentionally perform[] acts which [are] calculated to cause extreme physical pain to the victim" and not that the victim actually experience such pain. (*Id.,* at p. 271.) To the extent defendant argues that the jury might have believed that awareness of pain was not an element, there is no error because awareness of pain is, indeed, not an element. To the extent defendant argues the jury might have believed that awareness of pain *was* an element, there is still no error because finding an additional but unnecessary "element" could accrue only to his benefit.[23]

> b. *Failure to instruct on intoxication and mental disease relating to intent to torture for the torture-murder special circumstance*

Defendant contends that the trial court erred in failing to instruct on the relationship of intoxication and mental disease to the mental state necessary for the torture-murder special circumstance, that is, the intent to inflict extreme pain. We disagree.

As stated, the trial court instructed the jury that each special circumstance required a certain mental state that was included in its definition, that the jury could consider evidence of voluntary intoxication in determining whether

---

[23] Defendant claims that the trial court's assertedly erroneous failure to instruct adequately on the elements of the torture-murder special circumstance violated his "rights to due process under Article I, section 15 of the California Constitution and the Fifth and Fourteenth Amendments, to trial by jury under the Sixth Amendment, and to a principled basis for the determination of penalty under the Eighth Amendment." The point fails because, as we have concluded, the court instructed the jury adequately.

defendant had the requisite mental state, and that the jury could also consider evidence of mental disease, defect, or disorder in determining whether or not the defendant actually formed the requisite mental state. The court further instructed the jury that to find true the torture-murder special circumstance, it had to find that defendant "intended to inflict extreme, cruel, physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." Viewing the instructions as a whole, we conclude the jury was instructed adequately, if implicitly, that intoxication and mental disease were relevant to the requisite mental state, i.e., the intent to inflict extreme pain, in the torture-murder special circumstance.[24]

c. *Insufficient evidence of the torture-murder special circumstance*

Defendant attacks the sufficiency of the evidence to support the torture-murder special circumstance, both at the close of the People's case-in-chief and at the close of all the evidence, by attacking the sufficiency of the evidence to establish intent to torture under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution.[25]

■■■ We review a challenge to the sufficiency of the evidence to support a special circumstance finding as we review the sufficiency of the evidence to support a conviction. (*People v. Hillhouse, supra,* 27 Cal.4th 469, 497–498.)[26]

As mentioned, at the time defendant killed Mary Ann, the torture-murder special circumstance required the intent to kill, the intent to torture, and the commission of a kind of act calculated to cause extreme pain. (*People v.*

---

[24] Because we conclude the trial court did not err, we reject defendant's contention— identical to the one he made earlier in connection with the failure to instruct on intoxication and mental disease relating to the requisite mental state for murder by torture—that the asserted error violated article I, section 15 of the California Constitution, the right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and the right to a reliable sentencing procedure under the Eighth Amendment to that Constitution.

[25] For the reasons stated earlier in the discussion of the sufficiency of the evidence of murder by torture, we need not discuss separately defendant's related claim that the trial court erred in denying his motion to dismiss, under section 1118.1, the torture-murder special circumstance allegation for insufficiency of the evidence. (See *People v. Hillhouse, supra,* 27 Cal.4th 469, 496, fn. 2.)

[26] "We need not, and do not, reach the question whether the sufficiency-of-evidence review specified in the text is required under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I section 15 of the California Constitution." (*People v. Rowland* (1992) 4 Cal.4th 238, 271, fn. 11 [14 Cal.Rptr.2d 377, 841 P.2d 897]; accord, *People v. Berryman, supra,* 6 Cal.4th 1048, 1090, fn. 18.)

*Bemore, supra,* 22 Cal.4th 809, 839; *People v. Davenport, supra,* 41 Cal.3d 247, 271.) In resolving defendant's earlier claim that the evidence was insufficient to sustain his conviction of first degree murder on a theory of murder by torture, we found sufficient evidence to establish intent to torture. For the same reasons, we reject defendant's claim of insufficiency of the evidence as to the torture-murder special circumstance.

### 14. Exclusion of Defendant from Various Pretrial and Trial Hearings in Violation of His Right of Personal Presence

Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043. (*People v. Waidla, supra,* 22 Cal.4th 690, 741.)

Defendant contends the trial court erred by assertedly excluding him from a variety of pretrial and trial proceedings. The proceedings in question involved pretrial hearings on two defense continuance motions, one of which was held ex parte, in camera, and later repeated in open court; numerous bench conferences during voir dire related to confidential interviews of various prospective jurors and alternate jurors and to challenges for cause; proceedings—consisting of a bench conference, in camera hearing, and order to show cause hearing—related to defendant's communication with an attorney who was a stranger to the case;[27] and in-court conferences, outside the presence of the jury, related to guilt and penalty phase jury instructions.

On appeal, we apply the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from pretrial and trial proceedings, either in whole or in part, "insofar as the trial court's decision entails a measurement of the facts against the law." (*People v. Waidla, supra,* 22 Cal.4th 690, 741.)

After independent review, we find no error on the trial court's part in excluding defendant from any proceeding because we find no right on his part to be personally present.

---

[27] During voir dire, at a bench conference, defense counsel requested an ex parte, in camera hearing on an "extremely serious problem." In camera, defense counsel related that defendant showed his investigator a letter by Attorney Madelynn Kopple advising defendant to leave the trial to show that the appointment of defense counsel was a sham, but to show respect to the trial court while doing so. Following another in camera discussion with defense counsel and the prosecutor, the trial court ordered a hearing with Kopple regarding a purported attempt to disrupt the trial proceedings. At the conclusion of the hearing, the trial court stated that it would report the matter involving Kopple to the State Bar.

"Under the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' " (*People v. Waidla, supra,* 22 Cal.4th 690, 741.)

"Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a 'stage . . . that is critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' " (*People v. Waidla, supra,* 22 Cal.4th 690, 742; see also *United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482].)

Under article I, section 15 of the California Constitution, "a criminal defendant does not have a right to be personally present 'either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a " ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " ' [Citations.]" (*People v. Waidla, supra,* 22 Cal.4th 690, 742; see also *People v. Ochoa* (2001) 26 Cal.4th 398, 433–436 [110 Cal.Rptr.2d 324, 28 P.3d 78] [absence from bench discussions during voir dire]; *People v. Holt* (1997) 15 Cal.4th 619, 707 & fn. 29, 708 [63 Cal.Rptr.2d 782, 937 P.2d 213] [absence from various bench and in camera discussions, including bench discussions of a challenge for cause and in camera discussion of guilt phase jury instructions].)

And, lastly, under sections 977 and 1043, a criminal defendant does not have a right to be personally present, even in the absence of a written waiver, where he does not have such a right under article I, section 15 of the California Constitution. (*People v. Waidla, supra,* 22 Cal.4th 690, 742; *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

Having examined each of the proceedings in question, we cannot conclude with respect to any of the bench conferences, hearings related to defendant's communication with the attorney, or jury instruction conferences, that defendant's personal presence *either* was *necessary* for an "opportunity for effective cross-examination," for purposes of the Sixth Amendment's confrontation clause (*Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658]), *or* would have "contribute[d] to the fairness of the procedure" in any marginal way, for purposes of the Fourteenth Amendment's due process clause (*id.,* at p. 745), *or* bore a " ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge,' " ' "

for purposes of article I, section 15 of the California Constitution or sections 977 and 1043 (*People v. Bradford, supra,* 15 Cal.4th 1229, 1357). (See, e.g., *People v. Waidla, supra,* 22 Cal.4th 690, 742.) Defendant's arguments to the contrary are unduly speculative.

Defendant's purported absences during pretrial hearings for a continuance in January and February of 1992 require slightly greater discussion, but lead to no different conclusion. Defendant was absent from a January 1992 ex parte hearing requested by defense counsel and early portions of an in-court hearing on the same continuance motion later that same day. Defendant claims that if present, "he could have assisted counsel in making the case as to why a continuance was needed." He also claims that he could have vouched for the accuracy of counsel's representations about the work current and previous counsel had done thus far on the case. Counsel, however, explained to the court the importance of interviewing purportedly reluctant individuals on the East Coast; for defendant to have vouched for counsel's representations would not have enhanced the case for a continuance. Moreover, when defendant arrived during the in-court hearing, the court summarized that it was currently hearing a defense continuance motion. Presumably defendant could have given the court or counsel any information he had at that time. But he did not, and the trial court denied the continuance, although it agreed to postpone jury selection to a later date. Similarly, in February 1992, defense counsel moved for a continuance in defendant's absence, but the motion was largely argued and denied after he arrived in court.

### 15. *Cumulative Effect of Asserted Guilt Phase Errors*

Defendant contends that even if no single error requires reversal of the jury verdicts and findings returned at the guilt phase, the cumulative effect of guilt phase errors prejudicially affected the outcome of the trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions. We disagree. As already discussed, any error or possibility of error during the guilt phase was nonprejudicial and, considered together, they fare no better.

### C. *Penalty Phase Issues*

#### 1. *Victim Impact Argument*

Before the penalty phase, outside the presence of the jury, the prosecutor indicated that he intended to address "the actual suffering of the victim" during his penalty phase argument, "not just . . . [as] evidence of the impact on the victim" but also as "the circumstances of the crime and the actual suffering he caused." Defendant made no objection, and the trial court ruled that the prosecutor could so argue.

Subsequently, the prosecutor argued to the jury that evidence of Mary Ann's suffering could be considered as a circumstance of the crime, to be weighed against defendant's life. The prosecutor then proceeded to read portions of guilt phase testimony relating to Mary Ann's suffering, including an extensive reading of the testimony of her treating physician, Dr. Davies. The prosecutor also asked the jurors to "look into [their] hearts" and "try to feel the pain that Mary Ann Mahoney did to some minor extent." The prosecutor concluded, "Consider the sympathy [for defendant], but weigh it against this pain, and justice demands only one thing in this case, and I'm sorry for it, but it's the defendant's death."

Defendant argues that the trial court erred in ruling that the prosecutor could comment on the extent to which Mary Ann suffered. We disagree.

The trial court retains discretion to "ensure that argument does not stray unduly from the mark." (*People v. Marshall, supra*, 13 Cal.4th 799, 854–855.) Accordingly, the court's decision will not be disturbed on appeal absent an abuse of discretion.

At the penalty phase of a capital trial, victim impact argument, that is, argument on the specific harm a defendant has caused, is permissible under the Eighth Amendment to the United States Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597]; *People v. Yeoman, supra*, 31 Cal.4th 93, 147–148; *People v. Raley, supra*, 2 Cal.4th 870, 915.) Such argument is also permissible under California law as relevant to the circumstances of the crime, a statutory capital sentencing factor. (*People v. Edwards* (1991) 54 Cal.3d 787, 833 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see § 190.3, factor (a).)

Preliminarily, we note that defendant has failed to preserve this issue for appeal because he did not object at trial. (Cf. *People v. Boyette* (2002) 29 Cal.4th 381, 430 [127 Cal.Rptr.2d 544, 58 P.3d 391] [failure to answer a juror's question during trial].) Even assuming the issue were properly before us, the argument lacks merit. Evidence of Mary Ann's suffering was admissible as a circumstance of the crime. (See *People v. Brown, supra*, 31 Cal.4th 518, 573; *People v. Edwards, supra*, 54 Cal.3d 787, 833.) Accordingly, argument dealing with such evidence was not improper.

Defendant nevertheless maintains that argument dealing with Mary Ann's suffering was improper and calculated to invite an emotional and irrational response by the jury because no evidence had been presented on the impact of Mary Ann's death on the members of her family. But the prosecutor's argument related to the impact of defendant's actions *on Mary Ann herself.* Although the argument may have touched on an emotional subject, it also

touched on a relevant subject that could provide legitimate reasons to sway the jury to impose the penalty of death. (See *People v. Raley, supra,* 2 Cal.4th 870, 916.) "Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision." (*People v. Smith, supra,* 30 Cal.4th 581, 634.) The prosecutor's comments were based entirely on the evidence and properly related to the circumstances of the crime of which defendant was convicted.[28]

## 2. *Constitutionality of California Death Penalty Statute*

Defendant challenges various aspects of California's death penalty statute as violating the Eighth and Fourteenth Amendments to the United States Constitution. We have previously considered and rejected each of these challenges, and defendant offers no persuasive reason to reconsider our prior decisions. In summary:

California law defining first degree murder and the aggravating circumstances that the trier of fact may consider is neither unconstitutionally vague and overbroad nor fails to sufficiently narrow the class of defendants eligible for the death penalty. (*People v. Crew, supra,* 31 Cal.4th 822, 860; *People v. Gurule, supra,* 28 Cal.4th 557, 663–664; *People v. Staten* (2000) 24 Cal.4th 434, 462 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Arias* (1996) 13 Cal.4th 92, 187 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Crittenden, supra,* 9 Cal.4th 83, 154–156.)

The torture-murder special circumstance is not vague and overbroad. (*People v. Mincey, supra,* 2 Cal.4th 408, 454; *People v. Davenport, supra,* 41 Cal.3d 247, 265–271; *People v. Wade* (1988) 44 Cal.3d 975, 993–995 [244 Cal.Rptr. 905, 750 P.2d 794].)

The death penalty statute is not unconstitutional because of prosecutorial discretion (*People v. Kipp, supra,* 26 Cal.4th 1100, 1137) or because intercase proportionality review is not required (*People v. Crew, supra,* 31 Cal.4th 822, 860). The statute does provide for intracase proportionality review (see *People v. Martinez, supra,* 31 Cal.4th 673, 703), and, as we discuss below, defendant's sentence was not grossly disproportionate to the crime for which it was imposed.

---

[28] Because we find no error, we reject defendant's argument that any asserted error violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and to a reliable sentencing determination under the Eighth Amendment to that Constitution.

### 3. Proportionality of Defendant's Sentence

Defendant contends that the application of the death penalty in his case is unconstitutionally disproportionate to his personal culpability under both the California and United States Constitutions.

 A reviewing court determines whether a particular penalty given " 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity,' thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17 of the California Constitution. (*Solem v. Helm* (1983) 463 U.S. 277, 290–292 [77 L.Ed.2d 637, 103 S.Ct. 3001]; *People v. Fairbank* [(1997)] 16 Cal.4th 1223, 1256 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].)" (*People v. Cunningham, supra*, 25 Cal.4th 926, 1042.) To do so, we "examine the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. [We] must also consider the defendant's age, prior criminality and mental capabilities." (*People v. Cox, supra*, 30 Cal.4th 916, 970.)

Defendant deliberately poured a flammable liquid on Mary Ann, his unsuspecting companion, and set fire to her and the house she was in. He frankly told several people thereafter that he intended to kill her and described how he had set her on fire. Although defendant argued at trial that he did not possess the requisite intent to torture or to kill because of his intoxication, the evidence belied the contention. Moreover, defendant was not an immature child at the time of the offense; rather, he was a 37- year-old man who had some college education and had been steadily employed in the past. The punishment imposed cannot be deemed grossly disproportionate in light of these circumstances.

### 4. Cumulative Effect of Asserted Guilt and Penalty Phase Errors

Defendant contends that the cumulative effect of errors at the guilt and penalty phases requires reversal of the death judgment. We disagree. As we stated in *People v. Sapp, supra*, 31 Cal.4th 240, 316, "We have either rejected

on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors."

III. CONCLUSION

For the reasons stated above, the judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 29, 2004. George, C. J., did not participate therein.